173 P.3d 275 (2007)
Jack CHANDLER, Appellant,
v.
STATE of Washington, OFFICE OF the INSURANCE COMMISSIONER, Respondent.
No. 57853-7-I.
Court of Appeals of Washington, Division 1.
July 30, 2007.
Publication Ordered November 15, 2007.
*278 William F. Tri, Jelsing Tri West & Andrus PLLC, Everett, WA, for Appellant.
Elizabeth Christina Beusch, Atty. Gen. Office, Olympia, WA, for Respondent.
AGID, J.
¶ 1 Jack Chandler challenges the order revoking his Washington insurance agent's license. He asserts the Review Judge applied the wrong duty of care and burden of proof and her Final Order was not supported by substantial evidence. Under the recent Supreme Court holding in Ongom v. Department of Health, professional disciplinary hearings require clear and convincing proof.[1] The Review Judge based her ruling here on both the former preponderance of the evidence and the anticipated clear and convincing evidence standards and correctly rejected the Administrative Law Judge's use of caveat emptor as the standard of care. Chandler challenges the Review Judge's application of a heightened fiduciary standard of care, but we need not decide this issue because substantial evidence supports the Review Judge's decision under the statutory duty of care found in RCW 48.01.030. We affirm.

FACTS
¶ 2 The facts in this case are well-known to the parties and will be discussed only as they relate to the issues below.
¶ 3 Jack Chandler was a licensed insurance agent in California until he surrendered his license in 2001. He moved to Washington and obtained a resident insurance agent's license. His Washington license was revoked on June 18, 2004. While in Washington, Chandler targeted senior citizens as his clientele and represented himself as an elder planner. Chandler has created several limited liability corporations targeting seniors, including the Senior Loan Center, L.L.C., and a not-for-profit organization, Elder Planners of Washington.
¶ 4 On September 26, 2002, the Office of the Insurance Commissioner (OIC) issued an order revoking Chandler's license on the ground that he was untrustworthy, a source of injury and loss to the public, and not qualified to be an insurance agent. It listed the following reasons for this revocation order: (1) illegally issuing securities for public telephone and/or telephone service (Alpha Telecom) as indicated by the Consent Order Jones signed with the Department of Financial Institutions (DFI), Securities Division; (2) failure to notify the Commissioner of his address change as required by RCW 48.17.450; (3) violating RCW 48.17.475 by failing to promptly respond to two inquiries by OIC investigator Tom Talarico; and (4) violating RCW 48.17.070 and .090(3) by failing to disclose, when he applied for his Washington license, the eight investigations to which he was subject while licensed in California. On December 30, 2002, the OIC amended the Revocation Order, adding the following charges: (1) Chandler continued to contact Bill and Evelyn Kristjanson, a married couple who are each over 80 years old, and attempted to sell them a living will, trust, long-term care coverage, and a reverse mortgage after their daughter informed him *279 that her parents suffered from memory loss and confusion about financial matters; (2) Chandler used high-pressure sales tactics and misrepresented himself to Betty Husby by promising to help her pay lower property taxes in order to sell insurance products, including a reverse mortgage; (3) Chandler sold a living trust and attempted to sell a reverse mortgage to Ray Bruner, despite his son's request that Chandler stop contacting his father, and accepted $965 from Ray Bruner for trust documents that were not delivered; and (4) Chandler accepted $965 from Harold and Juanita Boeckel to create a living trust that was incorrect and became angry and intimidating during the course of the transaction. In these orders, the OIC found that his conduct showed Chandler was untrustworthy and a source of injury and loss to the public, in violation of RCW 48.17.530(h). The matter was referred to an administrative law judge (ALJ) at the Office of Administrative Hearings.
¶ 5 On September 26, 2003, the ALJ issued an Initial Decision and Order which rejected the Revocation Order on the ground that there was insufficient evidence of untrustworthiness and that the "law of caveat emptor remains the general rule in the consumer marketplace." The Initial Decision was referred to a Review Judge to issue a final order on behalf of the Insurance Commissioner, as required by RCW 34.05.464(4) and WAC 284-02-070(2)(b)(i). On June 18, 2004, the Review Judge rejected the ALJ's Initial Decision and issued a Final Order revoking Chandler's license.
¶ 6 In her Final Order, the Review Judge did not adopt all of the ALJ's findings or conclusions. She ruled that the ALJ applied an incorrect standard to determine Chandler's trustworthiness as an insurance agent because "[i]nsurance agents have a `duty of preserving inviolate the integrity of insurance.'" The Review Judge found the ALJ incorrectly applied the rule of the market-place, or caveat emptor, rather than the statutory requirement of integrity, honesty, and equity found in RCW 48.01.030. He therefore improperly placed the entire burden on the elderly consumers to protect themselves against being misled and injured by Chandler's actions. Quoting Tank v. State Farm Fire & Casualty Company,[2] she stated "[t]here is a fiduciary relationship between an insured and the insurance agent that requires not only `honest and lawfulness of purpose' but also a `broad obligation of fair dealing'" and reasoned that a heightened standard applied because "the responsibility of an agent to act fairly and honestly is heightened where, as in this case, the agent represents himself as a specialist interested in providing his clients `their options . . . to better handle life's certainties and uncertainties.'"[3] The Review Judge based her Findings of Fact and the following Conclusions of Law on violations of RCW 48.17.070, 48.17.520(1)(h), and 48.17.530(1)(b).[4]
¶ 7 Chandler appealed his license revocation to the Snohomish County Superior Court. That court affirmed the Review Judge's Final Order, ruling that there was substantial evidence of Chandler's untrustworthiness and that he was not qualified to be an insurance agent under RCW 48.17.530(1)(h). Chandler appeals.

ANALYSIS
¶ 8 Judicial review of a final administrative decision is governed by the Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW. "In reviewing administrative action, this court sits in the same position as the superior court, applying the standards of the WAPA directly to the record before the agency."[5] To the extent they modify or replace the ALJ's findings of fact and conclusions of law, a review judge's findings and conclusions are relevant on appeal.[6] We apply a substantial evidence standard to an agency's findings of fact but review *280 de novo its conclusions of law.[7] RCW 34.05.570 governs judicial review of an agency order. Reviewing courts may grant relief only if the party challenging the agency order shows that the order is invalid for one of the reasons set forth in RCW 34.05.570(3).[8] An agency's conclusion of law can be reversed or modified if "[t]he agency has erroneously interpreted or applied the law."[9] When reviewing factual issues, the substantial evidence standard is highly deferential to the agency fact finder.[10] When an agency determination is based heavily on factual matters that are complex, technical, and close to the heart of the agency's expertise, we give substantial deference to agency views.[11] Under this standard, evidence must be of a sufficient quantum to persuade a fair-minded person of the truth of a declared premise.[12] But courts will not weigh the evidence or substitute our judgment regarding witness credibility for that of the agency.[13] Findings of fact to which no error has been assigned are verities on appeal.[14]
¶ 9 Chandler challenges the Review Judge's Final Order on the grounds that it is unconstitutionally vague on its face and as applied, based on an erroneous interpretation and application of the law, not supported by substantial evidence, and arbitrary and capricious.[15]
I. Burden of Proof
¶ 10 Chandler correctly argues that the OIC must prove its case with clear, cogent, and convincing evidence. In Ongom v. Department of Health, the Supreme Court held that due process requires clear and convincing proof in professional licensing discipline cases.[16] Here, the Review Judge applied the correct standard and based her decision on both the preponderance and clear and convincing evidence standards.
II. Findings of Fact
¶ 11 Chandler asserts that the Review Judge erred because she failed to give "due regard" to the credibility determinations of the ALJ. OIC contends that the courts should give substantial deference to the findings of the Review Judge and that *281 the relevant inquiry is whether the record supports the findings in the final order. In RCW 34.05.464, WAPA sets forth procedures by which agencies may conduct internal reviews of initial orders.[17] RCW 34.05.464(4) provides that the reviewing officer shall exercise all decision-making powers that would have been necessary to decide and enter a final order had the Review Judge presided over the hearing, requiring only that the Review Judge give "due regard" to the fact finder's opportunity to observe witnesses. Because the Review Judge may substitute her findings for those made by the ALJ, it is the Review Judge's findings to which we apply the substantial evidence test on appeal.[18]
A. Market Lead Cards
¶ 12 In order to generate clients, Chandler mailed lead cards to 128,000 seniors in King and Snohomish counties. The cards advertised the availability of possible property tax exemptions and living trusts. When seniors responded to these cards, Chandler used the opportunity to sell other insurance products to them. These lead cards referred prospective clients to Chandler's "Elder Planners of Washington" website but did not indicate that a response to the card would result in a visit from an insurance agent. These cards confused some consumers who thought they were sent by the Snohomish County Assessor's Office. Several people complained to the Consumer Protection Division of the Office of the Attorney General which conducted an investigation and, on May 7, 2003, issued a consumer alert to warn consumers about this mailing. The Review Judge concluded that using these cards demonstrated untrustworthiness as an insurance agent.
¶ 13 The ALJ and the Superior Court both ruled that Chandler's use of the market lead cards alone may not support a finding of untrustworthiness. Chandler argues this means that the lead cards were not misleading or deceptive or prove that he is untrustworthy because he never represented that he was part of a government agency. Because the decision at issue is that of the Review Judge and the record before her on appeal, this argument is not persuasive. We do not *282 review the Superior Court's ruling.[19]
¶ 14 While not illegal, these lead cards engendered enough concern that the Attorney General's office issued a consumer warning, in part because Chandler targeted senior citizens who might be easily confused or unable to grasp the nature of the transactions he was proposing. The Review Judge's conclusion that the use of the cards was misleading and deceptive is supported by substantial evidence including calls to the Snohomish County Assessor's Office and Attorney General from confused consumers and Chandler's admission that the cards were used to gain access to seniors so he could sell them other products. Accordingly, we hold that substantial evidence supports the Review Judge's finding and the concomitant conclusion that this conduct demonstrated untrustworthiness.
B. Bill and Evelyn Kristjanson
¶ 15 Chandler sold a will and living trust to Bill and Evelyn Kristjanson, a married couple who are both over 80 years old. When their daughter, Phyllis, and son-in-law discovered that Chandler was contacting them, they told Chandler that they wanted to be present during any future meetings because her parents suffered from memory loss and confusion. Despite this request, Chandler returned to the Kristjansons' home to sell them insurance and a reverse mortgage. Phyllis again contacted Chandler and repeated her request that he stop contacting her parents, but Chandler continued to call the Kristjansons.
¶ 16 Chandler asserts the Kristjansons were able to comprehend reverse mortgages and other products when he met with them. He also argues that the Kristjansons' adult child's insistence on participating in their business, without the Kristjansons' express instructions, created a conflict of interest that he was merely attempting to avoid. He argues that OIC did not submit any evidence that Mr. Kristjanson was incompetent or unable to handle his own business without assistance from his daughter.
¶ 17 OIC asserts that Mr. Kristjanson's deposition, which was held one week prior to the hearing, clearly showed that he had only a vague memory of his dealings with Chandler and could not remember talking about extended care coverage, medical coverage, medical insurance, or a reverse mortgage with Chandler. OIC highlights Mr. Kristjanson's inability to understand what a reverse mortgage was. Further, OIC argues that Chandler's unwillingness to include the Kristjansons' daughter and son-in-law in the process and his continuing to contact the elderly couple even after they explained the problem to him demonstrates that Chandler cannot be trusted to conduct the business of insurance.
¶ 18 Chandler admits that he ignored the Kristjansons' children's request to stop speaking to the couple. He explains he viewed it as a "conflict of interest" because many children do not want their parents to take reverse mortgages and deplete their inheritance. The Review Judge reviewed Mr. Kristjansons' deposition testimony, which showed that his memory was failing and that he did not understand the products Chandler attempted to sell him. Whether or not Mr. Kristjanson was deemed incompetent or Chandler had proof of his cognitive difficulties, given the special vulnerability of elderly clients and Chandler's sale of complex financial products, it was entirely reasonable for these adult children to ask that they be involved. A careful insurance agent would have proceeded with caution when an elderly client's competency was questioned rather than pressing ahead, apparently to take advantage of the very confusion and memory loss about which he had been warned on more than one occasion. There is substantial evidence in the record to support the Review Judge's findings and conclusions that Chandler's conduct with the Kristjansons demonstrated that he cannot be trusted to conduct the business of insurance because he intentionally circumvented his putative clients' children's involvement in complex transactions despite clear warnings that the elderly couple could not make informed decisions on their own.
*283 C. Harold and Juanita Boeckel
¶ 19 Harold and Juanita Boeckel, an elderly couple, paid Chandler $965 to create a new living trust. This trust contained numerous errors, including disinheriting their daughters, characterizing monetary gifts to their children as loans, and naming Chandler as an alternative Trustee, Executor and Attorney-in-Fact without their consent. Despite their repeated requests, Chandler did not help them correct these errors. Eventually, the Boeckels hired another attorney for an additional $280 to make the necessary changes. When Chandler was unable to sell them annuities, Boeckel said Chandler became angry and intimidating.
¶ 20 Chandler argues that he never told the Boeckels that he wanted to be named on their Trust or impede its correction. Rather, he asserts that attorney Gregory Davies handled all aspects of the Boeckels' Trust and agreed to make changes to the Trust at no charge for the first year. Chandler contends that the Boeckels' decision to hire another attorney to correct the mistakes was their own and that he obtained a full refund from Davies as evidence of his good faith. Finally he asserts that he merely discussed the topic of annuities but did not present a specific product to Mr. Boeckel.
¶ 21 Boeckel testified that he did not know Davies was involved in the transaction. Other than a cover letter signed by Davies and an unsigned attorney-client agreement, the record does not show that Chandler told the Boeckels that Davies was involved when the transaction began. Because Chandler accepted payment from the Boeckels, he was responsible for completing the transaction. Given the nature of the transaction and the significant errors in the Trust documents, including Chandler's self-dealing act of naming himself as a fiduciary under the Trust, the evidence that the Boeckels were unaware of Davies' involvement, and the consistency of Boeckels' testimony, there is substantial evidence to support the Review Judge's findings about this transaction.
D. Alpha Telecom and Eileen Johnson
¶ 22 Chandler sold a reverse mortgage to Eileen Johnson, a 75 year old widow, after making contact with her through marketing lead cards. Chandler also sold her a $55,000 investment in Alpha Telecom with the proceeds of the reverse mortgage. Alpha Telecom was an investment in public-use pay telephone services that Chandler sold to Johnson and others. The Washington State Department of Financial Institutions (DFI) found Alpha Telecom was a security and issued a Cease and Desist Order because Chandler did not hold a securities license. Chandler entered into a Consent Order with DFI under which he paid the costs of the investigation and accepted a suspended fine.
¶ 23 Chandler argues that he did not knowingly sell securities when he sold the investment opportunity in Alpha Telecom and did not admit to any wrongdoing when he entered into the Consent Order with DFI. He also contends that the Review Judge improperly relied on hearsay testimony when making this finding because Eileen Johnson did not testify or provide a sworn statement. OIC argues that whether or not Chandler knew that the investments were securities, his interaction with Eileen Johnson and the circumstances leading up to her bankruptcy demonstrated Chandler's untrustworthiness.
¶ 24 The Review Judge found that Chandler's activities related to Alpha Telecom showed that he acted in an untrustworthy manner and was a source of injury and loss to the public. While Chandler emphasizes that Eileen Johnson did not testify and that the Review Judge lacked substantial evidence to find him untrustworthy, he does not dispute the fact that he sold Alpha Telecom to Johnson or that DFI ruled these investments were securities. Nor does he deny Johnson's losses. And the Consent Order was in the record to supply the facts supporting the Review Judge's conclusion. Accordingly, there is substantial evidence to support the Review Judge's findings and conclusions that Chandler's interaction with Eileen Johnson showed untrustworthiness and posed a risk of injury to the public given Johnson's advanced age, her reliance on the proceeds of the reverse mortgage, and Chandler's admission that he sold securities to her.
*284 E. Betty Husby
¶ 25 On February 14, 2002, 77 year old Everett resident, Betty Husby, faxed a complaint against Chandler and one of his associates, Mickey Larson, alleging that Chandler and Larson pressured her to sign documents she believed were for a reverse mortgage. She did not produce these documents because she said that Chandler took them with him and did not leave copies for her. Some time after Chandler and Larson left her home with the signed documents, Betty Husby contacted a friend, John Gait, who helped her prepare a rescission of contract form in order to protect her interests.
¶ 26 In the Initial Order, the ALJ stated that he found Betty Husby's testimony not credible because there was no evidence that Chandler sold her a reverse mortgage and the documents Chandler gave her during his first visit were several years' worth of property tax exemption applications. In his findings, the ALJ noted that Betty Husby testified that Chandler told her to "`sign the damn papers'" after "much ado and hesitation, in an off-the-record session" and that she added details about the incident during her testimony which were not in her initial complaint.[20] Further, the ALJ stated that "[a]lthough it is possible that a woman of Ms. Husby's generation might find the word `damn' objectionable, I find that her offense at this language was much exaggerated" because she used the word "hell" at both the hearing and in her deposition and had herself used the word "damn" during the course of the hearing. The ALJ concluded
I did not find Ms. Husby to be a credible witness. Without a doubt, if the allegations she made about Mr. Chandler standing over her and yelling "sign the damn papers!" could have been found credible, perhaps through any showing that she has signed anything other than an application for a senior property tax exemption that could only benefit her and not Mr. Chandler, this complaint could in and of itself have justified the revocation of Mr. Chandler's license. However, I conclude that Ms. Husby's suspicions of Mr. Chandler were initially without any basis and have only metastasized over time. Mr. Chandler's suggestion of a reverse mortgage and Ms. Husby's adverse reaction thereto does not mean that Mr. Chandler is unfit to be a licensed insurance agent. Ms. Husby has created an untrustworthy monster in her own mind, one that is not real.
The Review Judge rejected the ALJ's findings that Betty Husby was not credible and found that her recounting of the events was consistent from the time of her initial complaint.
¶ 27 Chandler expressly denies all allegations against him by Betty Husby, contending that he did not threaten, force, or coerce her to sign any papers during his visit to her home. He argues that the Review Judge abused her discretion when she rejected the ALJ's finding that Betty Husby's testimony was not credible. OIC argues that Betty Husby's allegations against Chandler were unwavering throughout the time of the hearings and asserts that she provided considerable consistent detail about the transaction and Chandler's aggressive behavior to support her complaint.
¶ 28 It is difficult to determine whether the Review Judge was justified in rejecting the ALJ's evaluation of Betty Husby's testimony. A Review Judge may substitute his or her findings for those of the ALJ, but she cannot reject credibility determinations without substantial evidence to the contrary in the record.[21] While we cannot determine what documents Betty Husby signed or whether or not Chandler spoke to her in offensive terms during their interaction, we note that the ALJ rejected her testimony because it was inconsistent, not because her demeanor was untrustworthy or unreliable. Like the Review Judge, we can look at the record to determine whether her testimony was substantively consistent. As such, the ALJ was not making a true credibility determination. We agree with the Review Judge that Ms. Husby's testimony was consistent throughout. The ALJ rejected it for an unsupported *285 reason, so the Review Judge could properly rely on it. Her testimony is substantial evidence of Chandler's improper conduct.
F. California Complaints
¶ 29 Chandler argues that he did not willfully misrepresent or fraudulently conceal complaints against him when he applied for his Washington insurance agent's license. He says he never received any field warnings and believed an earlier written complaint was unfounded. He asserts that he answered truthfully because he had not been subject to any disciplinary action in California. California calls consumer complaints "requests for assistance," rather than complaints. Based on this semantic difference, Chandler asserts that he believed the Washington application was asking him to disclose whether he had been charged with a violation or received a revocation, fine, or suspension of reprimand. This disingenuous argument insults the intelligence of the court. The application asked Chandler if any complaints have ever been filed with any insurance department. This clearly requires an applicant to disclose reported consumer unhappiness with his behavior no matter what name other states use to designate it. An OIC investigation uncovered eight California investigations of Chandler, five of which were initiated by consumer complaints. Two resulted in monetary recoveries, and four resulted in Field Warnings.[22]
¶ 30 In addition to the verbal warnings, in April 2000 Chandler received a written notice of a complaint from the California Insurance Department to which he responded. This written complaint was sent less than one year before he obtained his Washington resident license. The ALJ found that Chandler's failure to admit to this complaint did not justify license revocation. Again, the Review Judge may substitute her findings for those of the ALJ.[23] Here, Chandler admitted that he received the written notice and responded to it. Whether or not the April 2000 written complaint became part of a formal proceeding against Chandler, the application asked whether he had any complaints filed against him, and Chandler should have answered yes. RCW 48.17.090(3) provides that "[a]ny person willfully misrepresenting any fact required to be disclosed in any such application shall be liable to penalties as provided by this code." Accordingly, the Review Judge's findings and conclusions are supported by substantial evidence.
G. Pattern of Untrustworthiness
¶ 31 Chandler challenges finding of fact 20, which states that "[b]ased on the above activities, the Licensee has demonstrated himself to be, and is hereby deemed to be, untrustworthy and a source of injury and loss to the public." He argues that the mere fact of multiple complaints by itself is not enough to establish that he is untrustworthy and a source of injury and loss to the public. Even if that were true, the aggregation of complaints supported by substantial evidence supports the Review Judge's ruling.
III. Duty of Insurance Agents
¶ 32 In her Final Order, the Review Judge quoted RCW 48.01.030, stating that as a highly regulated industry the insurance business affects the public interest and requires that "`all persons be actuated by good faith, abstain from deception, and practice honest and equity in all insurance matters.[']" The Review Judge held that the ALJ applied the incorrect caveat emptor standard to insurance agents, who have a "`duty of preserving inviolate the integrity of insurance.'" She stated that the statutory *286 requirement of integrity, honesty, and equity under RCW 48.01.030 applies to insurance agents and all persons who engage in or seek to be engaged in insurance matters. As we noted above, she also evaluated Chandler's actions against the fiduciary standard set forth in Tank v. State Farm Fire & Casualty Company[24] and AAS-DMP Management, L.P. Liquidating Trust v. Acordia Northwest, Inc.[25] Chandler challenges her application of a fiduciary standard because heightened standards and levels of scrutiny apply to insurance brokers and insurers, but not to insurance agents.
¶ 33 The Review Judge correctly rejected the Administrative Law Judge's application of caveat emptor as the standard of care. Nothing in the statute or case law supports such a laissez-faire standard. We do not need to decide whether the Review Judge properly adopted a heightened standard of care because substantial evidence supports her decision under the statutory duty of care. RCW 48.01.030 provides:
The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.[[26]]
Under this standard, substantial evidence of multiple instances of misconduct supports the decision revoking Chandler's license.
IV. RCW 48.17.150(1)(f) and 48.17.530(1)(h)
¶ 34 Under RCW 48.17.150(1)(f), an applicant for an insurance agent's license must be "a trustworthy person." RCW 48.17.530 provides in part:
(1) The commissioner may suspend, revoke, or refuse to issue or renew any license which is issued or may be issued under this chapter or any surplus line broker's license for any cause specified in any other provision of this code, or for any of the following causes:
(a) For any cause for which issuance of the license could have been refused had it then existed and been known to the commissioner.
(b) If the licensee or applicant willfully violates or knowingly participates in the violation of any provision of this code or any proper order or regulation of the commissioner.
(c) If the licensee or applicant has obtained or attempted to obtain any such license through willful misrepresentation or fraud, or has failed to pass any examination required under this chapter.
. . . .
(h) If the licensee or applicant has shown himself to be, and is so deemed by the commissioner, incompetent, or untrustworthy, or a source of injury and loss to the public.
. . . .
¶ 35 Chandler argues that the term "untrustworthy" is unconstitutionally vague because it is a subjective determination. He asserts that because the ALJ, Review Judge and Superior Court reached different conclusions in his case, the term must be too subjective to apply to a license revocation proceeding.
¶ 36 The term "untrustworthy" need not be purely objective. And including a vague term in a statute does not necessarily render it impermissibly vague because courts do not analyze statutory words in isolation from the context in which they appear.[27] The common knowledge and understanding of members of a profession can clarify a statutory term, such as untrustworthiness, when no objective standard is provided.[28] The purpose of RCW 28.17.530 is to *287 protect the public and profession's standing in the eyes of the public. In the context of the common knowledge and understanding of members of the insurance profession, the terms "trustworthy" and "untrustworthy" are sufficiently clear to put an insurance agent on notice that certain conduct is prohibited. As the Supreme Court said about the term "moral turpitude" in Haley v. Medical Disciplinary Board,[29] the central question is whether the conduct in question reflects an unfitness to practice the profession. In Haley, the court explained that "[p]hysicians no less than teachers, . . . veterinarians, . . . police officers, . . . [or insurance agents] will be able to determine what kind of conduct indicates unfitness to practice their profession."[30]
¶ 37 At a minimum, Chandler failed to disclose at least one consumer complaint on his application. This alone could result in license revocation under RCW 48.17.530(1)(a) or (c). In addition, Chandler's conduct clearly falls within the range of conduct proscribed by RCW 48.17.530(h). Given his conduct toward Eileen Johnson, the Kristjansons, the Boeckels, and Betty Husby together with his selling Alpha Telecom securities, for which he was investigated and fined by DFI, and sending the lead cards, for which the Attorney General's Consumer Protection Division investigated and issued a consumer warning, it is difficult to imagine how the term "untrustworthy" as it is used in RCW 48.17.530(h) would not apply in this case. He cannot seriously contend that he did not know or realize or have adequate notice that this conduct would violate the statutory standard.[31]
V. Due Process
¶ 38 Chandler asserts that he was not on notice of the charges against him, particularly the charges related to Betty Husby and the marketing lead cards, and to Eileen Johnson and Alpha Telecom. This argument is without merit. Both the Husby and Johnson matters were included in the OIC orders. And his transactions with Betty Husby were included in the Additional Grounds for Revocation to Supplement and Amend Order Revoking License. While the order did not specifically use the phrase "marketing lead card," Chandler was on notice that this issue would arise because the amended order refers to Husby's complaint to the OIC which was based, in part, on his use of those cards.
¶ 39 Chandler also argues that the Review Judge's findings and Order Revoking License was arbitrary because other insurance agents have committed more egregious violations without such a harsh penalty. This argument is also meritless. We can reverse an agency order if "[t]he order is arbitrary or capricious."[32] Arbitrary and capricious actions are those that disregard the *288 facts and circumstances, and are unreasoned and without consideration.[33] But harshness is not the test for arbitrary and capricious action.[34] Where there is room for two opinions, an action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.[35] Chandler had a fair hearing with ample opportunity to present arguments and evidence. The Review Judge's Final Order was made upon due consideration of the facts and circumstances. It was neither arbitrary nor capricious.
¶ 40 We affirm the Review Judge's order revoking Chandler's license.
WE CONCUR: ELLINGTON and COX, JJ.

APPENDIX
The Review Judge made the following Findings of Fact and Conclusions of Law in her June 18, 2004 Final Order:
FINDINGS OF FACTS
Having considered the evidence and arguments presented at the hearing, the documents on file herein, and the subsequent briefs filed by both parties before the undersigned, the undersigned duly appointed Review Judge makes the following findings of facts:
1. The Licensee is a 50 year old man who, until 2001, was a resident of California. He held a California insurance agent's license and worked as an insurance agent there until he surrendered that license in 2001. He is now a resident of Washington. The Licensee's primary insurance clientele has always been senior citizens. Throughout his career as an insurance agent, the Licensee has made it a normal practice to meet with senior[s] in their homes. In addition to selling insurance products, the Licensee offers estate planning services to his clientele, including long term care insurance products, living trusts and reverse mortgages. . . .
2. As a means of making contact with potential clients, the Licensee has used lead cards. Generally, lead cards are mailed to prospective clients, advertising access to some information or service. When the recipient mails back the card, the card is sold to an insurance agent (or the insurance agent has paid for the mailing of these cards initially) and the insurance agent then calls at the home of the recipient/prospective client. Often the insurance agent then takes that opportunity to attempt to sell the recipient/prospective client other insurance products (long term care insurance, etc.) or other noninsurance products (living trusts, reverse mortgages, etc.), or to provide other information, in addition to that which has been advertised in the lead cards to which the recipients have responded.
3. In one of these lead card efforts, the Licensee arranged with a Texas company to mass mail some 128,000 lead cards to seniors in King and Snohomish Counties, which advertised the availability of a possible property tax exemption or federally insured reverse mortgage programs. Interested seniors were to complete the card and mail it back to the Texas company which then refers them on to the Licensee. The Licensee then arranged to come to the seniors' home to sell them insurance or other products. . . .
4. Insofar as it pertinent hereto, the Licensee has also used lead cards advertising the availability of information concerning living trusts. . . .
5. During the course of his career, the Licensee created, with another individual, several limited liability corporations, including The Life Insurance Store, Inc., Senior Loan Center, LLC, and The Centre, LLC (also known as the Centre for Living Trusts) . . . and another organization entitled Elder Planners of Washington. The Licensee represented himself as an "elder planner," who helps "seniors understand their options by intertwining the *289 benefits available from . . . government entities along with the private sector, such as insurers . . . to better handle life's certainties and uncertainties." . . . Thus, the Licensee acknowledges that he offers to assist seniors in getting property tax exemptions as a "gimmick" to allow him access to seniors' homes and the opportunity to evaluate them for other potential sales. . . .
6. In November 1999, the Licensee completed a Washington State application for an individual nonresidential insurance agent's license. . . . In March 2001, the Licensee completed a Washington State application for an individual resident insurance agent's license. . . . On both Washington applications, which were in due course granted by the Washington Office of the Insurance Commissioner (OIC), the applicant is asked: Have any complaints been filed against you with any Insurance Department? The Licensee responded NO to this question on both applications, and then signed the applications, certifying that the information was true and complete when he knew that his responses to this question was false.
7. In fact, on April 13, 2000, the Consumer Services Division of California's Department of Insurance (Cal Insurance) wrote to the Licensee informing him that an elderly consumer had filed a request for assistance, claiming that the Licensee had refused to return various documents regarding a living trust. Cal Insurance instructed the Licensee to respond directly to the consumer's "complaint" and noted that he would not hear from Cal Insurance again unless the agency determined that the consumer's complaint was justified. . . .
8. Further, although the Licensee had never been involved in any "formal disciplinary action resulting in administrative penalties," in California, he had been the subject of eight investigations conducted by Cal Insurance, five of which were the result of citizen complaints. Four of these cases were closed with a "field warning given to the Licensee." . . .
9. On February 15, 2002, the OIC opened an investigation into some of the Licensee's activities. In the course of the investigation, the OIC mailed the Licensee written inquiries to his current registered address (707 6th Avenue [S]outh, Edmonds, WA 98020) on February 21 and 25, 2002 and March 13 and 22, 2002. All of these letters were return[ed], separately, marked by the U.S. Postal Service as "Chandler, Jack Moved Left No Address Unable to Forward Return to Sender." . . . The Licensee failed to promptly respond to these letters. There was insufficient evidence presented to show exactly where the Licensee's residence was during this period.
10. Betty Husby is an approximately 77 year old woman who resides in Everett, Washington. Ms. Husby had responded to a lead card advertising information about living trusts. In response, on February 5, 2002, Mickey Larson, an associate of the Licensee, came to her home. The Licensee had conducted research into Ms. Husby's property, accessing public records to confirm property ownership and any existing liens. . . . Mr. Larson advised Ms. Husby that he was helping senior citizens pay fewer taxes, and she let him inside. Mr. Larson showed Ms. Husby a copy of her county property assessment record and said that he would return. On February 12, 2002, Mr. Larson and the Licensee returned to Ms. Husby's home. The Licensee talked with Ms. Husby for some two hours, and attempted to sell her a reverse mortgage so that, he advised, she could have more income and pay fewer taxes. Ms. Husby advised the Licensee that she was not interested in a reverse mortgage. At that point, the Licensee became agitated and when she refused to sign some papers he put in front of her, the Licensee stood over Ms. Husby and said "I'm not losing my commission. . . . You're going to sign this." Ms. Husby was alone with these two men, felt threatened and feared for her physically safety. Ms. Husby reluctantly signed the paper. The Licensee then put two more pages in front of her and told her to sign them as well, which she did out of fear. *290 The Licensee then took papers Ms. Husby had signed, leaving no copies at all and advised her he would return the following week. . . . Ms. Husby then contacted a friend, John Galt, who contacted the Licensee and [t]old him not to return to her home, served papers upon the Licensee rescinding any transaction which he might have entered into and who proceeded to investigate the Licensee, which eventually culminated in Ms. Husby filing a complaint with the OIC. . . . In regard to the OIC's allegation against the Licensee relative to the Husby transaction, Ms. Husby's complaint filed with the OIC, her subsequent deposition testimony and her testimony at hearing are all quite consistent.
11. Bill and Evelyn Kristjanson (Kristjansons) are a married couple who are each over 80 years old. Bill Kristjanson, at least, has a difficult time with memory loss and understanding financial documents. . . . While getting out of the car to attend and testify at the hearing herein, Mr. Kristjanson fell and injured himself and so neither he nor his daughter, Phyllis, were able to testify herein. However, Mr. Kristjanson did provide deposition testimony earlier and Phyllis' complaint to the OIC was included as evidence herein. In the summer of 2001, the Licensee sold the Kristjansons a will and living trust for approximately $8900. A few months later, the Licensee returned to sell long-term care coverage for Evelyn Kristjanson. The payment for the long-term care coverage was to come from a reverse mortgage on their home. When Phyliss Kristjanson discovered this, her husband (a former OIC examiner) called the Licensee [and said] that the reverse mortgage transaction was to be cancelled and requested that, because the elder Kristjansons experience memory loss and confusion, he did not directly contact the elder Kristjansons further, but instead work through Phyliss or himself. In January 2002, Phyliss Kristjanson discovered that the Licensee had returned to her parents' home with the intention of selling the long-term care coverage via a reverse mortgage. Phyliss Kri[s]tjanson advised the Licensee again not to contact her parents, but, a few hours later, she discovered that the Licensee had again contacted her parents against her wishes. The Licensee stated that he believed that the Kristjansons were competent to conduct an estate planning transaction with him and explained that he would not honor Phyliss Kristjanson's request to provide her with her parent's document because he honors his clients' right to privacy. . . . Given the specific situation concerning the Kristjansons, the Licensee's activities found herein demonstrate that he is untrustworthy.
12. Very similar facts to those set forth directly above regarding Kristjanson were presented, and were the subject of Findings of Fact in the Initial Decision, concerning the Hill/Patterson transaction involving the Licensee. However, because this matter was not alluded to in the Order Revoking License of Supplemental Order, they were not considered by the undersigned.
13. The OIC also presented facts involving Pritchett and Great Republic Life in its case against the Licensee, and were the subject of several Findings of Fact in the Initial Decision. However, this matter was not alluded to in the Order Revoking License or Supplemental Order, they were not considered by the undersigned.
14. In January 2002, Harold and Juanita Boeckel (Boeckels), elderly Washington residents, contacted the Licensee to update their living trust. . . . The Licensee convinced them that it would be easier to create a new one and charged them $965 to do so. . . . The Licensee drafted the new trust document, and when the Boeckels received it, they discovered many errors: Mr. Boeckel's first name was misspelled several times, two of their daughters were disinherited, monies previously given to their children were shown as loans instead of gifts, and the Licensee had inserted himself as an alternate Trustee, alternate Executor, and alternate Attorney-in-Fact and notarized the trust documents himself after bringing his own witnesses (two of his business associates, DeRenzo and Larson) to serve as witnesses even though Mr. Boeckel had already arranged for his *291 neighbors to witness his documents. . . . Mr. Boeckel never indicated that he wanted the Licensee to be the alternate executor of his will nor give him power-of-attorney over his assets. . . . When the Boeckels were unable to have the Licensee correct the Trust, they sought the assistance of another attorney and for an additional $280 made the necessary changes. . . . The Licensee also tried to sell them annuities, but when they told him they were not interested in buying the annuities, the Licensee persisted in attempting to sell them and eventually became angry and intimidating to the Boeckels. . . . The Licensee's activities in regard to the Boeckel transaction demonstrate that he is untrustworthy and a source of injury and loss to the public.
15. Prior to May 2002, the Licensee entered into an agreement with Alpha Telecom to sell, and subsequently did sell, public-use pay telephones and telephone services to senior citizens on behalf of Alpha Telecom. . . . The "investor" was to receive 30% of the adjusted gross revenue generated by the telephones, or a monthly base amount of $46.67 per $4,000 [worth of] telephone[s] purchased or $58.34 per $5,000 [worth of] telephone[s] purchased, which equated to a 14% annual return. . . . The Licensee was not licensed as a securities agent to sell these securities.
16. As a result of his activities regarding Alpha Telecom, the Washington State Department of Financial Institutions (DFI), Securities Division, issued a Cease and Desist Order, SDO-9-02 against the Licensee and other individuals based upon its determination that the Licensee had engaged in offering and/or selling securities without a Washington securities license. On May 22, 2002, the Licensee agreed to a Consent Order, SDO-48-02 with DFI vacation Order No. SDO-9-02 and agreed to pay DFI $7,500 for its costs incurred in its investigation of the matter. The Licensee further agreed that, based on the Findings of Fact and Conclusions of Law, he would be subject to a fine in the amount of $50,000 with the entire amount suspended based on future compliance with DFI's Order. In the event of a violation of the Order, DFI will seek enforcement of the Order pursuant to RCW 21.20.395.
17. Eileen Johnston, a 75 year old widow, was visited by the Licensee in her home after she had mailed in a lead card requesting information on living trusts. As Ms. Johnston had limited financial resources, the Licensee set up a reverse mortgage and sold her $55,000 investment in Alpha Telecom paid out of the proceeds of the reverse mortgage. As a result, Ms. Johnston filed for bankruptcy and expected to lose her home of 50 years. . . .
18. The Licensee's activities relative to Alpha Telecom demonstrate that he is untrustworthy and a source of injury and loss to the public, which bear on his qualifications to be an insurance agent.
19. As found in Findings of Facts 2 and 3 above, the Licensee uses a direct marketing service to mail postcards to senior citizens regarding the possibility of a senior citizen property tax exemption, and listed his identity as "Chandler and Assoc., Everett, WA,["] or "information provided by www.epwa.org," referring prospective clients to his "Elder Planners of Washington["] web site. . . . These mailers were confusing consumers and many consumers believed that these cards were being sent to the county assessors' offices. . . . Further, there is no indication a response to this card will result in a visit from an insurance agent who will likely to attempt to sell the senior insurance products and/or reverse mortgages, living trusts and the like. Additionally, the Office of the Attorney General, Consumer Protection Division performed an investigation into the Licensee's use of these lead cards . . . and found that these mailers were misleading. As a result, on May 7, 2003, the Attorney General issued a consumer alert to warn consumer[s] of the Licensee's direct mail solicitation. . . . These mailings were, indeed, misleading and deceptive. Further, the Licensee used these marketing cards as a "gimmick" [Testimony of the Licensee][[36]] *292 to get his foot in the door of elderly consumers' homes to then sell them other products such as reverse mortgages, living trusts, long term care and other insurance policies. . . . Based upon this finding that these specific marketing cards are misleading and deceptive, the Licensee's use of these specific cards demonstrates that the Licensee is untrustworthy, which bears upon his qualifications to act as an insurance agent.
20. Based upon the above activities, the Licensee has demonstrated himself to be, and hereby is deemed to be, untrustworthy and a source of injury and loss to the public.
21. The OIC's Order Revoking License entered September 26, 2002, as supplemented by Additional Grounds for Revocation to Supplement and Amend Order Revoking License entered by the OIC on December 30, 2002, which revokes the insurance agent's license of Jack Chandler, is reasonable under the circumstances and should be confirmed.
CONCLUSIONS OF LAW
1. The Administrative Law Judge from the Office of Administrative Hearings had jurisdiction over the parties and subject matter herein and authority to enter the Initial Decision herein, pursuant to RCW 48.04.010(5), Chapter 34.05 RCW, and Chapter 34.12 RCW. . . .
2. The undersigned recognizes that there is currently in Washington State some uncertainty in case law concerning whether the preponderance of the evidence standard of proof or the clear and convincing standard of proof applies to professional licensing cases. In recognition that current case law has not reiterated either the historically established standard of proof which has applied to insurance agents licensing cases (preponderance of the evidence) or the new, higher[] standard of proof which has been recently applied to medical doctors (clear and convincing evidence), the undersigned has applied both standards of proof in this case. The undersigned has determined that, upon applying either of the two standards, the OIC has met its burden of proof as to the violations found herein.
3. As found above, in his Washington applications for a nonresident and then a resident insurance agent's license, the Licensee failed to disclose complaints which had been filed against him with the California Insurance Department, when he knew of the existence of these complaints. In so doing, he violated RCW 48.17.070 and obtained or attempted to obtain his insurance agent's licenses through willful misrepresentation or fraud as contemplated by RCW 48.17.530(1)(c).
4. Based upon the facts found above, it cannot be concluded that the Licensee failed to promptly notify the Commissioner of a change of residential or business address in violation of RCW 48.17.450. As a result, it cannot be concluded that the Licensee failed to respond promptly in writing to the Commissioner in violation of RCW 48.17.475.
5. In the Initial Decision, the OAH [Office of Administrative Hearings] dismissed the above facts concerning the Husby transaction, on the basis that Ms. Husby's testimony was not credible in that it was not consistent with the complaint she had previously filed with the OIC and was not consistent with her deposition testimony. The undersigned concludes that Ms. Husby's complaint, deposition and testimony at hearings are, indeed, remarkably consistent and therefore that the OAH's disregard of Ms. Husby's testimony was in error. Should the ALJ have disregarded Ms. Husby's testimony based upon demeanor, however, the undersigned would have deferred to that judgment. Such was not the case here, however, and the undersigned concludes that the testimony of Ms. Husby was consistent and therefore should not have been disregarded.
6. Based upon the above Findings of Fact[] concerning the Licensee's activities involving Betty Husby, the Licensee has demonstrated that he is untrustworthy as contemplated by RCW 48.17.530(1)(h).
7. It should be noted that, as argued by the OIC, there need not be a regulation *293 which requires an insurance agent to include potential insureds' children (upon request) in insurance transactions to render it a violation if they are not included. Indeed, such a regulation would not be reasonable. Instead, as argued by the OIC, well established case law dictates that each situation be evaluated as to whether the insurance agent's actions are trustworthy or not. In this situation, with the fact[] found above, that at least Bill Kristjanson suffered from memory loss and confusion, and given the other facts surrounding this transaction, the Licensee's actions in not ensuring that the children were included, the Licensee has demonstrated that he is untrustworthy as contemplated by RCW 48.17.530(1)(h).
8. The OIC's charges against the Licensee concerning the Alpha Telecom matter was dismissed in error. The action taken against the Licensee by the Washington Department of Financial Institutions, which determined that he had engaged in offering and selling securities without a securities agent's license, bears on his trustworthiness to be an insurance agent. For this reason, it is here concluded that the facts, found above regarding the Licensee's activities relative to Alpha Telecom and the Washington Department of Financial Institutions, and which include the Johnson matter, demonstrate that he is untrustworthy and a source of injury to the public as contemplated by RCW 48.17.530(1)(h).
9. At the close of the OIC's case-in-chief, the OAH dismissed the charges concerning the Boeckel matter on the basis that he did not find that the Licensee's conduct was untrustworthy. These charges were dismissed in error. Based upon the facts found above, which are fairly consistent with the OAH's discussion in the Initial Decision, the undersigned concluded that, in his activities related to the Boeckel matter, the Licensee demonstrated that he is untrustworthy and a source of injury and loss to the public as contemplated by RCW 48.17.530(1)(h).
10. Based upon the facts found above, the Licensee's use of the subject marketing cards which concerned possible property tax exemptions which were the subject of the County Assessors' complaints and were the subject of the Attorney General's consumer warning, and which were found above to be misleading and deceptive, demonstrate that he is untrustworthy as contemplated by RCW 48.17.530(1)(h).
11. Based upon the above conclusions of law, to the effect that the Licensee has failed to disclose in his Washington insurance agent's license applications that eight complaints had been filed against him in California in violation of RCW 48.17.070 and RCW 48.17.530(1)(c), and to the effect that the Licensee has in many instances demonstrated himself to be, and has so deemed to be, untrustworthy and a source of injury and loss to the public and not qualified to be an insurance agent in the state of Washington as contemplated by RCW W48.17.530(1)(h) [sic], the Initial Decision in this matter should not be adopted and the OIC's Order Revoking License, No. D 02-152, as supplemented by Additional Grounds for Revocation to Supplement and Amend Order Revoking License, should be upheld.
NOTES
[1] 159 Wash.2d 132, 148 P.3d 1029 (2006), cert. denied, ___ U.S. ___, 127 S.Ct. 2115, 167 L.Ed.2d 815 (2007).
[2] 105 Wash.2d 381, 385-86, 715 P.2d 1133 (1986).
[3] (Second alteration in original.)
[4] See Appendix.
[5] Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993) (citing Macey v. Dep't of Employment Sec., 110 Wash.2d 308, 312, 752 P.2d 372 (1988)).
[6] Id. at 406, 858 P.2d 494.
[7] Premera v. Kreidler, 133 Wash.App. 23, 31, 131 P.3d 930 (2006).
[8] Under RCW 34.05.570(3),

[t]he court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;
(d) The agency has erroneously interpreted or applied the law;
(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
(f) The agency has not decided all issues requiring resolution by the agency;
(g) A motion for disqualification under RCW 34.05.425 or 34.12.050 was made and was improperly denied or, if no motion was made, facts are shown to support the grant of such a motion that were not known and were not reasonably discoverable by the challenging party at the appropriate time for making such a motion;
(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or
(i) The order is arbitrary or capricious.
[9] RCW 34.05.570(3)(d).
[10] Premera, 133 Wash.App. at 32, 131 P.3d 930 (quoting ARCO Prods. Co. v. Utils. & Transp. Comm'n, 125 Wash.2d 805, 812, 888 P.2d 728 (1995)).
[11] Id. at 31, 131 P.3d 930 (citing Hillis v. Dep't of Ecology, 131 Wash.2d 373, 396, 932 P.2d 139 (1997)).
[12] Id. (citing In re Elec. Lightwave, Inc., 123 Wash.2d 530, 542-43, 869 P.2d 1045 (1994)).
[13] Id. (citing Affordable Cabs, Inc. v. Dep't of Employment Sec., 124 Wash.App. 361, 367, 101 P.3d 440 (2004)).
[14] Id. (citing Davis v. Dep't of Labor & Indus., 94 Wash.2d 119, 123, 615 P.2d 1279 (1980)).
[15] RCW 34.05.570(3)(a), (d)-(e), (i).
[16] 159 Wash.2d 132, 148 P.3d 1029.
[17] RCW 34.05.464 provides in relevant part:

(1) As authorized by law, an agency may by rule provide that initial orders in specified classes of cases may become final without further agency action unless, within a specified period, (a) the agency head upon its own motion determines that the initial order should be reviewed, or (b) a party to the proceedings files a petition for administrative review of the initial order. Upon occurrence of either event, notice shall be given to all parties to the proceeding.
(2) As authorized by law, an agency head may appoint a person to review initial orders and to prepare and enter final agency orders.
(3) RCW 34.05.425 and 34.05.455 apply to any person reviewing an initial order on behalf of an agency as part of the decision process, and to persons communicating with them, to the same extent that it is applicable to presiding officers.
(4) The officer reviewing the initial order (including the agency head reviewing an initial order) is, for the purposes of this chapter, termed the reviewing officer. The reviewing officer shall exercise all the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing, except to the extent that the issues subject to review are limited by a provision of law or by the reviewing officer upon notice to all the parties. In reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officer's opportunity to observe the witnesses.
(5) The reviewing officer shall personally consider the whole record or such portions of it as may be cited by the parties.
(6) The reviewing officer shall afford each party an opportunity to present written argument and may afford each party an opportunity to present oral argument.
(7) The reviewing officer shall enter a final order disposing of the proceeding or remand the matter for further proceedings, with instructions to the presiding officer who entered the initial order. Upon remanding a matter, the reviewing officer shall order such temporary relief as is authorized and appropriate.
(8) A final order shall include, or incorporate by reference to the initial order, all matters required by RCW 34.05.461(3).
(9) The reviewing officer shall cause copies of the final order or order remanding the matter for further proceedings to be served upon each party.
[18] See Valentine v. Dep't of Licensing, 77 Wash. App. 838, 894 P.2d 1352, review denied, 127 Wash.2d 1020, 904 P.2d 300 (1995).
[19] Tapper, 122 Wash.2d at 406, 858 P.2d 494.
[20] (Footnote omitted.)
[21] RCW 34.05.464(4) requires that she "give due regard to the presiding officer's opportunity to observe the witnesses."
[22] According to the California Department of Insurance, a Field Warning is a verbal warning that the activity is improper and violates the California Insurance Code. It stretches credulity to believe Chandler was unaware of any of these "requests for assistance."
[23] RCW 34.05.464(4) provides in part:

The reviewing officer shall exercise all the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing, except to the extent that the issues subject to review are limited by a provision of law or by the reviewing officer upon notice to all the parties. In reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officer's opportunity to observe the witnesses.
[24] 105 Wash.2d at 385-86, 715 P.2d 1133.
[25] 115 Wash.App. 833, 839-40, 63 P.3d 860, review denied, 150 Wash.2d 1011, 79 P.3d 445 (2003).
[26] (Emphasis added.)
[27] State v. Foster, 91 Wash.2d 466, 474, 589 P.2d 789 (1979).
[28] Haley v. Med. Disciplinary Bd., 117 Wash.2d 720, 742, 818 P.2d 1062 (1991) (citing Cranston v. City of Richmond, 40 Cal.3d 755, 765, 710 P.2d 845, 221 Cal.Rptr. 779 (1985); Morrison v. State Bd. of Educ., 1 Cal.3d 214, 461 P.2d 375, 82 Cal.Rptr. 175 (1969)).
[29] 117 Wash.2d 720, 742, 818 P.2d 1062 (1991).
[30] Id. at 743, 818 P.2d 1062.
[31] Chandler argues that it is unconstitutionally vague to determine "untrustworthiness" on a case-by-case basis. He offers Megdal v. Oregon State Bd. of Dental Examiners, 288 Or. 293, 605 P.2d 273 (1980), to argue that RCW 48.17.530(h) should not apply unless the licensee violates specific enumerated acts as defined as "untrustworthy." The Megdal case is unworkable in the context of this and similar cases. In Megdal, the Oregon Supreme Court held that a licensee may be held to a legislatively-mandated standard of conduct only if rules have been adopted to specifically define the prohibited acts. But there, the statutory standard of professional conduct contained a list of specifications which the court interpreted as indicating the Board's intent to particularize the rules. Here, no such list has been created by the Legislature or the OIC. Given the myriad ways in which an insurance agent or broker can violate the public trust, particularly those who serve elderly clients, the Legislature did not intend to limit the OIC's ability to regulate or discipline agents based on a particularized list. Further, Chandler argues unconvincingly that the Alpha Telecom securities issue was outside his insurance practice and that, like Megdal, he should not be charged for conduct committed outside of his insurance practice without proper notice. Chandler's use of reverse mortgages, sale of insurance, advertisement of property tax incentives, and consultation on other estate matters appear to have been part of his overall scheme to gain access to seniors in order to sell them numerous products, including insurance. Chandler intertwined these activities in practice and may not now be allowed to untangle them in order to avoid discipline.
[32] RCW 34.05.570(3)(i).
[33] Heinmiller v. Dep't of Health, 127 Wash.2d 595, 609, 903 P.2d 433, 128 Wash.2d 492, 909 P.2d 1294 (1995), cert. denied, 518 U.S. 1006, 116 S.Ct. 2526, 135 L.Ed.2d 1051 (1996).
[34] Id.
[35] Id.
[36] (Alteration in original.)