[No. 63362-7-I. Division One. August 23, 2010.]

KURSHIDA ISLAM, *Appellant*, v. THE DEPARTMENT OF EARLY LEARNING, *Respondent*.

602

*Jean M. Schiedler-Brown*, for appellant.

*Robert M. McKenna, Attorney General,* and *Diane L. Dorsey, Assistant,* for respondent.

¶1 BECKER, J. — The Department of Early Learning revoked appellant Kurshida Islam's child care center license. The department's burden of proof in an adjudicative proceeding, as provided by statute, is the preponderance of the evidence. Islam contends the importance of a licensee's private interest requires proof by clear and convincing evidence as a matter of due process. But in defining the nature of the State's interest, the legislature expressly states that the interests of the children in care are "paramount" over the right of any person to provide care. When due weight is given to the State's interest, the legislative mandate for proof by a preponderance of the evidence

reflects a constitutionally permissible allocation of the risk of error. We reject Islam's request to overturn the statute.

¶2 The Department of Early Learning was created by the legislature in 2006. LAWS OF 2006, ch. 265; *see* ch. 43.215 RCW. The department administers child care and early learning programs and adopts minimum licensing requirements. RCW 43.215.020(2)(d); RCW 43.215.200(2). It is unlawful for any agency to care for children unless the agency is licensed as provided in the chapter. RCW 43.215.250(1).[1] Licensing requirements for child care centers are found in chapter 170-295 WAC. The regulations include minimum requirements for staffing; programming; health and nutrition; care of infants; safety and environment; agency practices; and the recording, reporting, and posting of information.

¶3 Islam held a license to provide child care at a facility located in Seattle until the license was suspended on January 17, 2007. Charlotte Jahn, a licensor for the department, testified at the administrative hearing that she investigated several complaints about the center between 2002 and 2007. Of particular concern were rule violations she documented during a visit to the center in February 2004. A preschool age child answered the door unattended; an infant was sleeping in a car seat; piles of papers, books, and magazines were stacked to the ceiling; an empty glass fish tank sat on an unsecured shelving unit; and an outdoor play area contained piles of broken equipment and a feces-strewn rabbit hutch. Upon returning one week later, Jahn found that some of these problems had not been corrected. Jahn made findings at this time of an unsafe environment, deficient record keeping, and inadequate supervision.

¶4 Jahn did not consider the findings documented in the record of her visits prior to 2007 as amounting to cause to revoke the center's license. The decision to revoke was

---

[1] Parents and guardians and certain kinds of schools and entities are exempted from the definition of "agency." RCW 43.215.010(2).

precipitated by Jahn's observations during an unannounced visit to the center on January 8, 2007. According to unchallenged findings of fact, Jahn arrived and found the facility cluttered, with puzzle pieces, soiled tissues, and cereal on the floor. The only staff member present was Islam's niece, Salina Begum, who was caring for five toddlers and an infant. This was a violation of the required staff to child ratio. Salina could not find the first aid supplies when asked and did not know where the children's files were kept. She was unable to tell Jahn the names or ages of some of the children present, although she had worked at the center for a year. She made no attempt to restrain the toddlers from climbing on the table and windowsill. It appeared to Jahn that Salina had no plan for the children's activities.

¶5 Soon, Islam returned to the center with her sister, Saida Begum. Islam had gone on an errand nearby, leaving Saida and Salina at the center caring for three children. Then Saida, complaining of a sudden headache, left the center and found Islam. Islam learned from Saida that more children had arrived. Realizing that Salina had been left alone with too many children, Islam returned with Saida to the center. Islam had trained both her sister and her niece to call in additional staff when necessary to comply with the staff to child ratio, but neither of them had done so.

¶6 After Islam's arrival, Jahn observed more violations. Saida took three toddlers into the toddler room and left them alone without supervision while she went to the kitchen. An uncovered and unlabeled infant bottle was found in the refrigerator. Islam could not produce documentation that Salina had completed first aid training. Jahn found no emergency plan in the file of an asthmatic and allergic boy. Jahn documented findings of inadequate supervision and record keeping and a failure to maintain easily accessible first aid supplies.

¶7 Later that day, Jahn returned, and she and Islam signed a compliance agreement. A compliance agreement is

a document wherein the licensor identifies areas of the operation that are out of compliance, and the licensee agrees to achieve compliance by a certain date. Islam had signed similar compliance agreements after Jahn documented similar findings during her two visits in February 2004.

¶8 On January 12, 2007, another event occurred that focused the department's attention on Islam's child care center, although ultimately it did not serve as a basis for the decision to revoke her license. A seven month old baby was injured at the center while being held in Saida's lap. Saida was sitting on the floor with the baby and several toddlers who were playing and listening to music. One of the toddlers, who was holding a plastic toy in one hand and a metal car toy in another, fell and landed on the baby. Islam checked the baby over but did not call a doctor or the baby's mother. When the mother arrived to pick up the baby, the mother was distraught and called 911. The next day, the mother took the baby to a doctor. The doctor observed facial abrasions and bruising serious enough to warrant the attention of a physician, but nothing that required further treatment or testing.

¶9 On January 13, 2007, Jahn learned of the incident with the baby. Child Protective Services had initiated an investigation of an allegation that the baby's injury was the result of negligent treatment, maltreatment, or abuse. It is the department's practice to summarily suspend a provider's license when a child has been injured at a child care facility until an investigation is completed. Jahn notified Islam that the center's license was being summarily suspended effective January 16, 2007. Islam appealed the notice of summary suspension. While that appeal was pending, Islam received notice that the center's license was also being revoked, effective March 9, 2007, for failure to meet minimum licensing requirements. The notice itemized the violations observed by Jahn during her visit on January 8, 2007, as well as earlier complaints that were investigated and found to be valid.

¶10 Islam contested both the suspension and revocation decisions. After a three day hearing in June 2007, an administrative law judge concluded that the department had acted prematurely by summarily suspending the license based solely on the fact that an investigation of the baby's injury was pending. Nevertheless, the judge upheld the department's decision to revoke the center's license because of the documented violations of licensing rules. A review judge for the department affirmed the license revocation order and also reinstated the summary suspension. Islam petitioned for judicial review. The superior court affirmed. The decision of the superior court is now before us on appeal.

¶11 As the party asserting the invalidity of the final agency order, Islam has the burden of demonstrating invalidity. We apply the standards of the Administrative Procedure Act, chapter 34.05 RCW, directly to the administrative record, sitting in the same position as the superior court. We review legal conclusions de novo to determine whether the review judge correctly applied the law, including whether the factual findings support the legal conclusions. Constitutional challenges are questions of law subject to de novo review. Statutes are presumed constitutional. The party challenging the constitutionality of a statute has a heavy burden to establish that the statute is unconstitutional beyond question. In order to declare a statute unconstitutional, a court must find that the conflict between the statute and the constitution is plain beyond a reasonable doubt. *Hardee v. Dep't of Soc. & Health Servs.*, 152 Wn. App. 48, 54-55, 215 P.3d 214 (2009), *review granted*, 168 Wn.2d 1006 (2010).

## STANDARD OF PROOF

¶12 The statute alleged by Islam to be unconstitutional provides that the Department of Early Learning must apply a preponderance of evidence standard of proof in adjudicative proceedings regarding the suspension or revocation of a license:

In any adjudicative proceeding regarding the denial, modification, suspension, or revocation of any license under this chapter, the department's decision shall be upheld if it is supported by a preponderance of the evidence.

RCW 43.215.300(2).

¶13 Islam contends the proper standard of proof is clear and convincing evidence. She relies on *Bang D. Nguyen v. Department of Health, Medical Quality Assurance Commission*, 144 Wn.2d 516, 29 P.3d 689 (2001), *cert. denied*, 535 U.S. 904 (2002), and *Ongom v. Department of Health, Office of Professional Standards*, 159 Wn.2d 132, 148 P.3d 1029 (2006), *cert. denied*, 550 U.S. 905 (2007). In those cases, the Washington Supreme Court determined that due process requires the clear and convincing evidence standard of proof for, respectively, revocation of a doctor's medical license and revocation of a registered nursing assistant's license. Islam argues that the license for her child care center deserves no less protection.

¶14 We reject this argument for two reasons. First, the licenses in *Nguyen* and *Ongom* were professional licenses issued to individuals under the Uniform Disciplinary Act, chapter 18.130 RCW. A child care license, as this court determined in *Hardee*, is more in the nature of a site license. A child care center license is issued by the Department of Early Learning for a period of three years, and it applies only to the location stated in the application. RCW 43.215.260. It is issued to an "agency," not to an individual. *See* RCW 43.215.200(4), .205(3). An "agency" can be "any person, firm, partnership, association, corporation, or facility that provides child care." RCW 43.215.010(1). The director or program supervisor must have a minimum number of college credits and experience. WAC 170-295-1010, -1020. But it is not necessary for the licensee to have any particular level of training or experience.

¶15 Second, the preponderance standard used in this case is mandated by statute—unlike in *Nguyen* and *Ongom*, where the preponderance standard was adopted

merely by regulation. Islam must carry a heavy burden to justify declaring a statute unconstitutional. The burden is particularly heavy here because the legislature expressly states that the department's mission to safeguard and promote the health, safety, and well-being of children "is paramount over the right of any person to provide care." RCW 43.215.005(4)(c).

¶16 The legislature's declaration identifies the State's interest to be weighed in the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). *Mathews* sets forth three factors to consider when identifying the specific dictates of due process in a given situation:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

¶17 The standard of proof is a procedural safeguard that serves to "allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). In applying *Mathews* and *Addington*, the *Nguyen* court determined that the lower standard of proof increased the risk of erroneous license revocations. The court concluded that the private interest and the governmental interest both weighed in favor of the higher burden of proof because the government shared with the licensee a common interest in "medical disciplinary hearings which reach an accurate and reliable result." *Nguyen*, 144 Wn.2d at 533. The court decided that maintaining the availability of physicians was in the public interest:

> It makes little sense to contend either the health of the public or its confidence in the medical profession is bolstered by the

erroneous de-licensure of qualified physicians. The public is ultimately dependent upon the provision of a physician's services, not their elimination.

*Nguyen*, 144 Wn.2d at 533.

¶18 Relying on *Nguyen*, Islam contends the State's interest as well as the licensee's is served by the more exacting standard of proof because an erroneous delicensure means the public will be erroneously deprived of access to and benefit from child care services.

¶19 Raising the standard of proof decreases the risk that adequate child care centers will be closed down. But it also increases the risk that inadequate child care centers will be permitted to keep their doors open. It is for the legislature, not the courts, to decide to what degree maintaining the availability of child care centers is in the public interest. We understand RCW 43.215.005(4)(c) as a legislative judgment that the State's interest in protecting children has a higher priority than the State's interest in an ample supply of child care centers.

¶20 The legislative declaration also speaks to the State's interest in avoiding increased fiscal and administrative burdens. The *Nguyen* court saw no increased fiscal burden arising from an increased burden of proof, as there would likely be no change in the cost of holding a hearing. *Nguyen*, 144 Wn.2d at 532. But the cost of a hearing is only one part of the department's regulatory operations. Making it harder to revoke the licenses of unqualified care givers could well mean more costly investigations, more hearings, more litigation concerning injured children, and increased monitoring for dubious providers. With respect to these burdens, too, we must give weight to the legislature's choice to set a preponderance of evidence standard for the department's enforcement actions.

¶21 Islam would have us override the legislature's judgment based on the first *Mathews* factor, the importance of her private interest. She contends the private interest affected by revocation is as great as in *Nguyen* and *Ongom*

because of the potential for ending the licensee's career in child care. An individual who has been "disqualified" by the department may not be present on the premises of a licensed or certified facility. WAC 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(7). As further justification for a higher burden of proof, Islam also contends revocation of a child care center license is a "quasi-criminal" proceeding, a characterization the Supreme Court has applied to medical disciplinary proceedings. *Nguyen*, 144 Wn.2d at 528-29, citing *In re Revocation of License of Kindschi*, 52 Wn.2d 8, 10-11, 319 P.2d 824 (1958).

¶22 As someone who has had a license revoked for reasons not involving abuse, Islam has not been accused of quasi-criminal wrongdoing. She is in the category of individuals the department "may" disqualify from providing child care. WAC 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(7)(e). If Islam applies for any type of license or certification involving child care in the future, the revocation will have the collateral consequence of subjecting her to a more exacting level of scrutiny than would otherwise be the case. It does not mean she may never again work as a provider of care.

¶23 We acknowledge a child care license represents a valuable private interest. But unlike a disciplinary proceeding as described in *Kindschi*, an enforcement action by the Department of Early Learning does not necessarily focus on the licensee personally. A deficiency in the facility or staff may be the basis of the revocation. WAC 170-295-0100(4). And the decision to revoke a child care center license does not involve an inquiry by members of a learned profession into alleged misconduct by a professional peer, so it does not carry the same stigma or censure as professional discipline. The fundamental concern is the enforcement of statutory requirements established by the State for the operation and suitability of the child care facility. RCW 43.215.300(1). For these reasons, we do not agree that Department of Early Learning enforcement actions are quasi-criminal in nature.

¶24 If an individual's private interest were the only factor to be considered in a due process analysis, the preponderance of the evidence standard could never be

used. The safety of small children in state licensed care is an important governmental interest, and it is reasonable for the legislature to place it above the economic interests of child care providers. Children may be the only witnesses of unsafe and even abusive activities in a child care center, yet be unable to provide competent testimony at a hearing. Their interests are served by a system that can enforce licensing standards by a preponderance of the evidence.

¶25 In summary, Islam did not hold a professional license. She held a limited, site-specific license subject to supervision and unannounced visits. The license was issued with the qualification that her interest in it was subordinate to the State's responsibility for protecting Washington's children. If the standard of proof is raised, children are exposed to a greater risk of receiving inadequate care. That result is unsatisfactory here in light of the legislative policy to the contrary. We follow *Hardee* in declining to extend *Nguyen* and *Ongom* to child care center licensees. Islam has not carried the heavy burden of establishing beyond question that RCW 43.215.300(2) is unconstitutional.

## SUMMARY LICENSE SUSPENSION

¶26 Islam contends it was unlawful for the department to suspend her license summarily upon learning of the investigation by Child Protective Services into the injury to the baby. The administrative law judge agreed that summary suspension could not occur based on mere allegations rather than proof. The review judge reversed this portion of the initial order. Three issues are presented: (1) Does revoking the license render the summary suspension moot? (2) If not, did the review judge have authority to review the portion of the initial order concerning the summary suspension, when neither party identified it as an issue on review? (3) If so, did the summary suspension violate the department's statutory authority?

¶27 As to mootness: an issue is moot if a court can no longer provide effective relief to a party on the issue.

*In re Pers. Restraint of Mines*, 146 Wn.2d 279, 283, 45 P.3d 535 (2002). Any issue concerning the summary suspension is technically moot because even if the suspension could be undone, the revocation of the license would still stand and prevent Islam from operating the center. However, in order to give guidance to the department and licensees and to prevent future litigation on these issues, we will consider the summary suspension. *See Mines*, 146 Wn.2d at 285.

¶28 As to the authority of the review judge: Islam contends a review judge may not review any portion of the initial order that is not specifically appealed. She cites two rules governing the procedure for taking an appeal to a review judge from the initial order by the administrative law judge. "If a party disagrees with the reasoning and result of an initial order and wants it changed, the party must request review by the review judge." WAC 170-03--0550(2). "If no one requests review of the initial order or if a review request is dismissed, the initial order becomes the [Department of Early Learning's] final decision." WAC 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.

¶29 The cited rules do not divide the decisions within an initial order into separate portions that become final if they are not specifically included in the appeal. Under the Administrative Procedure Act, an agency review judge may review and change *any* portion of an initial order that has been appealed by *any* party:

> The reviewing officer shall exercise all the decision-making power that the reviewing officer would have had to decide and enter the final order had the reviewing officer presided over the hearing, except to the extent that the issues subject to review are limited by a provision of law or by the reviewing officer upon notice to all the parties.

RCW 34.05.464(4).

¶30 The department was willing to let the initial order become final because it achieved the department's objective. Islam, however, wanted the result changed, so she appealed the initial order to the review judge. Once the initial order

was appealed, the review judge had authority to review and revise the portion dealing with the summary suspension.

¶31 As to the merits of the department's decision to suspend the center's license summarily: The department acted under a regulation authorizing summary suspension when "(a) It finds that conditions in the licensed facility constitute an imminent danger to a child or children in care; or (b) The public health, safety, or welfare requires emergency action." WAC 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(1). Islam contends the regulation conflicts with a statute requiring the department to base a license suspension on "proof" of a violation or licensing deficiency:

> An agency may be denied a license, or any license issued pursuant to this chapter may be suspended, revoked, modified, or not renewed by the director upon proof (a) that the agency has failed or refused to comply with the provisions of this chapter or the requirements adopted pursuant to this chapter; or (b) that the conditions required for the issuance of a license under this chapter have ceased to exist with respect to such licenses.

RCW 43.215.300(1). In Islam's view, neither the accidental injury of the child nor the fact of a pending investigation amounted to "proof" under this statute.

¶32 In an emergency, the department has authority to take immediate action. RCW 43.215.305(2)(b). In a situation that requires immediate action, the requirement of "proof" does not preclude the department from acting upon information that has not yet been tested in a hearing. In this case, the department acted based on reliable information that a seven month old child had been injured. The review judge found it is the department's practice to order a summary license suspension when a child is injured at a child care facility:

> The Department decided that the Appellant's license should be summarily suspended, in part because of the young age of the infant who was injured. Infants are particularly vulnerable because they are unable to move out of the way or protect

themselves from accidents or injuries. It is the Department's practice to summarily suspend a provider's license when a child has been injured at a child care facility until an investigation is completed and a determination is made regarding the circumstances of the child's injury. The Department reasons that if there was an injury, then something happened, and that this means sufficient evidence exists that there is a possible health and safety risk serious enough to warrant stopping the provision of care until the Department finds out what happened.

¶33 The letter advising Islam of the summary suspension stated the suspension was pursuant to WAC 170-295--0100. This regulation identifies numerous circumstances warranting license suspension, including failure to provide adequate supervision to children in care. WAC 170-295--0100(4)(d). Thus, the department's information about the infant's injury and the pending investigation amounted to more than mere allegations of conditions satisfying RCW 43.215.300(1). We conclude the department had adequate "proof" to justify a summary suspension. The review judge did not err in disagreeing with the administrative law judge on this point. The emergency action regulation, WAC 170--03-0300(1), does not conflict with RCW 43.215.300(1).

## SUFFICIENCY OF THE EVIDENCE

¶34 The review judge upheld the revocation based on the licensing violations Jahn observed during her visits to the child care center in February 2004 and January 2007. Islam contends the findings concerning these violations were insufficient to support revocation. She argues she corrected the deficiencies observed in 2004 and had agreed on a plan of correction in 2007. She contends the department, by signing the compliance agreement, accepted her plan to correct the itemized violations and could not then revoke her license based on those same violations.

¶35 This argument is unsupported by pertinent authority or facts in the record. The compliance agreement

the parties signed on January 8, 2007, specified the regulatory violations Jahn observed on that date and set forth Islam's plan to bring the center into compliance. The agreement contemplated a fine of up to $250 per day per item of noncompliance if Islam did not complete the plan of correction by the agreed on date. But the agreement did not limit enforcement action to a fine. By signing it, Islam also adopted this statement: "I understand that the department may also take other licensing action for failure to meet licensing requirements." Because the compliance agreement specifically reserved the department's right to take "other licensing action," the agreement did not require the department to give Islam more time to correct deficiencies.

¶36 Relying on a regulation that defines a repeated violation as one that occurs "more than once during a twelve-month time frame," Islam also contends the violations documented in 2004 and 2007 were too far apart in time to justify revocation. However, the regulation in question, WAC 170-296-0020, does not apply to child care centers. The regulations that apply to child care centers do not require that violations be repeated before a license can be revoked.

¶37 Finally, Islam contends it was arbitrary for the department to revoke her license based on two isolated events over a three year period. But while the review judge relied on observations by Jahn during visits occurring three years apart, on each date Jahn documented numerous violations the department regarded as serious:

> The Appellant's acts or failures to act have resulted in the Appellant violating licensing rules regarding maintenance of files and records for children and center staff, maintenance of required supplies, maintenance of a safe environment for the children, adequate supervision and maintenance of staff/child ratios. The Appellant and her staff also lack the good judgment and personal characteristics to provide the children in the Appellant's licensed child care center a healthy, safe and responsive environment. The record supports a conclusion the Appellant's poor judgment extends across a substantial period

of time and multiple violations of the licensing rules intended to ensure the health and safety of children in her care. The statute is clear and express that the right of the Appellant to provide child care as a licensee is superseded by the right of children in care outside their homes to be assured of a safe and healthy environment.[2]

¶38 The arbitrary and capricious test is a very narrow standard, and the one asserting it must carry a heavy burden. *In re Disciplinary Proceeding Against Brown*, 94 Wn. App. 7, 16, 972 P.2d 101 (1998), *review denied*, 138 Wn.2d 1010 (1999). In reviewing matters within agency discretion, the court must limit its function to assuring that the agency has exercised its discretion in accordance with law and may not itself undertake to exercise the discretion that the legislature has placed in the agency. RCW 34.05.574(1). A discretionary agency decision will not be set aside absent a clear showing of abuse. *Schuh v. Dep't of Ecology*, 100 Wn.2d 180, 186, 667 P.2d 64 (1983). On this record, we do not find the department's exercise of its discretion to be unreasonable.

¶39 Affirmed.

ELLINGTON and APPELWICK, JJ., concur.

---

[2] Initial order, conclusion 6, incorporated by reference into the final order and review decision, conclusion 2.