FILED
COURT OF APPEALS
DIVISION II

2013 JUN 19 AM 8: 31

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| OLYMPIC HEALTHCARE SERVICES II LLC, | No. 42992-6-II |
| Appellant, | |
| v. | |
| DEPARTMENT OF SOCIAL & HEALTH SERVICES, STATE OF WASHINGTON, | PUBLISHED OPINION |
| Respondent. | |

QUINN-BRINTNALL, J. — Olympic Healthcare Services II LLC (Olympic II) appeals the superior court's decision affirming the Department of Social and Health Services (DSHS) Board of Appeals' (Board) final order revoking its adult family home license. Olympic II argues that the Board's reviewing judge (1) erred by using preponderance of the evidence as the standard of proof, (2) violated the appearance of fairness doctrine, and (3) erred by concluding that Olympic II was operating overcapacity. Olympic II's legal arguments lack merit and the Board's reviewing judge properly concluded that Olympic II was operating overcapacity. We affirm.

## FACTS

Galina Baida is a licensed practical nurse. Baida owns Olympic II, an adult family home. Baida also owns a second adult family home, Olympic Healthcare Services I (Olympic I). Olympic I is located across the street from Olympic II. The residents of Olympic I are primarily

adults with developmental disabilities and the residents of Olympic II are adults with dementia. Baida and her mother are the caregivers for Olympic I. Baida hires staff as caregivers for Olympic II. Olympic II is staffed with one caregiver per shift to meet the minimum requirement of one caregiver per six dementia residents.[1]

On November 2, 2009, at approximately 1:30 PM, Candace Corey, a DSHS complaint investigator, arrived at Olympic II to conduct an investigation into a complaint received by DSHS's Complaint Resolution Unit. When Corey arrived at Olympic II, she observed one caregiver, the 6 residents of Olympic II, and 2 residents from Olympic I. Around 3:00 PM, 2 additional residents from Olympic I arrived at Olympic II. Between 3:30 and 4:00 PM, a fifth resident from Olympic I arrived at Olympic II resulting in as many as 11 residents from both homes in Olympic II while Corey was there. During this period of time, there was one caregiver in the home and Baida, who was primarily speaking with Corey.

Based on her observations on November 2, 2009, Corey cited Olympic II for operating over the maximum license capacity of six residents. Former WAC 388-76-10960 (2008).[2] In addition to Corey's observations of Olympic II operating overcapacity on November 2, 2009, the citation included two additional incidents when residents from Olympic I were at Olympic II. On December 16, DSHS issued a "Stop Placement of Admissions and Revocation of License"

---

[1] Former WAC 388-76-10195 (2008).

[2] Former WAC 388-76-10960 reads, in relevant part,
> [DSHS] may impose a remedy or remedies if [DSHS] finds any person listed in WAC 388-76-10950 has:
>
> . . . .
>
> (14) Exceeded license capacity in the operation of an adult family home.

notice for Olympic II. On January 6, 2010, Baida requested an administrative hearing to contest the stop placement and revocation notice.

At the administrative hearing, Corey testified to the events she had observed on the afternoon of November 2, 2009. Tami Shumake, one of the caregivers working at Olympic II at the time of the investigation testified that the residents from Olympic I often came over to Olympic II on Saturdays when Baida and her mother were at church and there was no caregiver at Olympic I. Paul Tosch, the Regional Long-Term Care Ombudsman, testified that he had received two complaints about Olympic I residents spending Saturdays at Olympic II. On November 9, 2009, Tosch had received a call from two of his volunteers who reported that the residents from Olympic I were still being taken to Olympic II on Saturdays. On November 21, 2009, Tosch went to Olympic II to investigate the complaint. He observed four residents from Olympic II and two residents from Olympic I in the living room. The other two Olympic II residents were asleep in their rooms.

Baida testified that the Olympic I residents had formed relationships with the Olympic II residents during a period when all the residents had to reside in one home due to flooding.[3] As a result, the Olympic I residents would visit the Olympic II residents but they were never required to go to Olympic II. Prior to allowing Olympic I residents to visit Olympic II, Baida would check with the Olympic II caregiver. Gary Otterness, Olympic II's resident care manager, also testified. Otterness's testimony was similar to Baida's.

---

[3] Olympic I suffered serious structural damage during the flooding and was uninhabitable for a period of time. During this period, Baida had sought and received permission from DSHS to combine the residents of the two houses temporarily. During the period that Olympic I residents were combined with Olympic II residents, DSHS carefully monitored the situation and kept in close contact with Baida.

On August 3, 2010, the administrative law judge (ALJ) issued her initial order. The ALJ concluded that DSHS had failed to prove Baida operated Olympic II overcapacity. DSHS petitioned for Board review of the ALJ's initial order.

On April 8, 2011, the Board's reviewing judge issued a review decision and final order. The Board's reviewing judge based her findings of fact

> upon careful consideration of the record, including the demeanor and motivations of the witnesses as observed and recognized by the ALJ and the undersigned, respectively; the reasonableness of the testimony and exhibits; the amount of time that has elapsed between when any particular incident occurred and when various individuals provided statements or evidence about that incident; and the totality of the evidence presented.

Administrative Record (AR) at 30. The Board's reviewing judge also made explicit and detailed credibility findings when there was conflicting evidence.

The Board's reviewing judge concluded that the appropriate standard of proof in this case was preponderance of the evidence, upon which she made 15 findings of fact specifically related to the overcapacity allegation. The Board's reviewing judge found that Olympic I residents were regularly sent to Olympic II because there was no caregiver at Olympic I, especially on Saturdays when Baida and her mother were at church. The Board's reviewing judge also addressed the conflicting testimony by making a detailed credibility finding:

> There was substantial evidence put forth by various individuals that [Baida] was often absent from [Olympic I] and [Olympic II] on Saturdays; that this was [Baida's] day of worship as a Seventh Day Adventist and she did attend church with her mother and Mr. Otterness; that [Olympic I] residents were staying at [Olympic II] on these days; that some [Olympic I] residents did not always like being at [Olympic II] but had no other choice; and that there was no caregiver at [Olympic I] and only one caregiver at [Olympic II] at these times. The sheer number of people of [sic] who provided this information coupled with their overall lack of motivation for fabricating such facts, when weighed against [Baida's] and Mr. Otterness's reasons for disputing this information and in light of Mr. Otterness's tendency during his testimony to contradict many facts not favorable to [Baida's] case and to change his testimony while testifying, lead the

undersigned to conclude that [Baida's] and Mr. Otterness's testimony are not credible. They often attended church with her mother, the [Olympic I] caregiver, on Saturdays and required some [Olympic I] residents to go to [Olympic II] during this time.

AR at 55 (footnotes omitted).

Based on the definitions of "capacity" found in ch. 70.128 RCW and former ch. 388-76 WAC, the Board's reviewing judge rejected Olympic II's argument that "capacity" refers to only the number of residents actually living in the home. Therefore, the Board's reviewing judge concluded that Olympic II had operated overcapacity and she upheld DSHS's license revocation.

Olympic II filed a petition for review in the Lewis County Superior Court. The superior court affirmed the Board's reviewing judge's final order. Olympic II timely appeals.

ANALYSIS

Our review of an agency action is governed by the Administrative Procedure Act (APA), ch. 34.05 RCW. The party seeking relief bears the burden of demonstrating the invalidity of the agency action. RCW 34.05.570(1)(a). We may reverse an agency action if the agency erroneously interpreted or applied the law, the order is not supported by substantial evidence, or the order is arbitrary or capricious. RCW 34.05.570(3)(d), (e), (i). We review the Board's reviewing judge's final order, not the ALJ's decision or the superior court's order. *See Tapper v. Empl. Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). "An agency order is supported by substantial evidence if there is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *Hardee v. Dep't of Soc. & Health Servs.*, 172 Wn.2d 1, 7, 256 P.3d 339 (2011) (internal quotation marks omitted) (quoting *Thurston County v. W. Wash. Growth Mgmt. Hearings Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008)). We review conclusions of law de novo. *Hardee*, 172 Wn.2d at 7.

No. 42992-6-II

BURDEN OF PROOF

Olympic II argues that the Board's reviewing judge erred by applying the wrong burden of proof. The Board's reviewing judge determined that the appropriate burden of proof was preponderance of the evidence. But Olympic II contends that the burden of proof should have been the clear and convincing evidence standard. Our Supreme Court has held that the burden of proof for revoking a facility license is preponderance of the evidence. Accordingly, the Board's reviewing judge did not err by applying the preponderance of the evidence standard.

Our Supreme Court has articulated two different burdens of proof that apply to license revocations. In *Nguyen v. Department of Health Medical Quality Assurance Commission*, 144 Wn.2d 516, 526, 29 P.3d 689 (2001), *cert. denied*, 535 U.S. 904 (2002), our Supreme Court applied the three-part *Mathews*[4] test to conclude that due process requires proof by clear and convincing evidence to revoke a professional license. In determining that the state must be held to a higher burden of proof before revoking Nguyen's medical license, the court primarily relied on an individual's "profound" interest in his or her professional license. *Nguyen*, 144 Wn.2d at 527. In *Ongom v. Department of Health, Office of Professional Standards*, 159 Wn.2d 132, 148 P.3d 1029 (2006), *overruled by Hardee*, 172 Wn.2d 1, our Supreme Court held that revocation of State registration as a nursing assistant was indistinguishable from revocation of a medical license and, thus, due process required proof by clear and convincing evidence.

But after the decisions in *Nguyen* and *Ongom*, our Supreme Court recognized that "the Court of Appeals [had] struggled to determine which evidentiary standard should apply to

---

[4] *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Under *Mathews*, the courts apply a three-factor test to determine the level of due process protections required in procedural situations. The three *Mathews* factors are (1) the private interest at stake, (2) the risk of erroneous deprivation, and (3) the government interest. 424 U.S. at 335.

administrative hearings that affect an individual's ability to engage in [his or] her occupation of choice." *Hardee*, 172 Wn.2d at 9 (citing *Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 32 P.3d 1039 (2001); *Kabbae v. Dep't of Soc. & Health Servs.*, 144 Wn. App. 432, 192 P.3d 903 (2008); *Brunson v. Pierce County*, 149 Wn. App. 855, 205 P.3d 963 (2009); *Islam v. Dep't of Early Learning*, 157 Wn. App. 600, 238 P.3d 74 (2010); *Chandler v. Office of Ins. Comm'r*, 141 Wn. App. 639, 173 P.3d 275 (2007), *review denied*, 163 Wn.2d 1056 (2008); *Nims v. Wash. Bd. of Registration*, 113 Wn. App. 499, 53 P.3d 52 (2002)). To clarify this confusion, our Supreme Court explicitly overruled its decision in *Ongom*. *Hardee*, 172 Wn.2d at 18.

In doing so, our Supreme Court drew a distinction between professional licenses and other state licenses. *Hardee*, 172 Wn.2d at 8-9. Under *Hardee*, administrative revocation of a nonprofessional license requires proof by a preponderance of the evidence. 172 Wn.2d at 18. However, *Nguyen* continues to control the revocation of a professional license, which requires proof by clear and convincing evidence. *Hardee*, 172 Wn.2d at 18.

To determine the difference between a professional license and a nonprofessional license, the court considered "the time, expense, and education invested to obtain the license." *Hardee*, 172 Wn.2d at 16. *Hardee* addressed the standard of review required to revoke a home child care license. 172 Wn.2d at 3-4. The court indentified three factors that distinguished a home child care license from a professional license: (1) The license adheres to the facility and not the individual provider, (2) DSHS can revoke the license for the misconduct of someone other than the provider, and (3) obtaining a license only requires completion of state approved training. *Hardee*, 172 Wn.2d at 10. Because Olympic II's adult family home license shares the same three characteristics as Hardee's home child care license, we hold the same standard of proof applies to revocation of adult family home licenses.

7

Olympic II is licensed as an adult family home under ch. 388-76 WAC. An adult family home is "[a] residential home in which a person or entity [is] licensed to provide personal care, special care, room, and board to more than one but not more than six adults who are not related by blood or marriage to the person or persons providing the services." Former WAC 388-76-10000 (2008). Therefore, the adult family home license attaches to the facility used as the adult family home and not to the provider who obtains the license. *Hardee*, 172 Wn.2d at 10. Furthermore, DSHS may revoke an adult family home license for any violation of the applicable statutes or codes regardless of who committed the violation. Former WAC 388-76-10960; *Hardee*, 172 Wn.2d at 10. Finally, the relevant minimum qualifications to obtain an adult family home license are state mandated training and either practical experience or a professional healthcare license (i.e., physician, physician's assistant, registered nurse, etc.). Former WAC 388-76-10130; *Hardee*, 172 Wn.2d at 10. Because the characteristics of an adult family home license are most similar to the characteristics the *Hardee* court held to be dispositive, the Board's reviewing judge did not err by concluding the burden of proof for revoking an adult family home license is preponderance of the evidence.

APPEARANCE OF FAIRNESS

Olympic II also alleges that the Board's reviewing judge violated the appearance of fairness doctrine. Specifically, Olympic II argues that the Board's reviewing judge was biased because she was employed by DSHS and that the Board's reviewing judge's bias was evident because she rewrote many of the ALJ's findings of fact and conclusions of law in order to reverse the ALJ's initial decision. Olympic II's contention lacks merit.

The appearance of fairness doctrine is meant to prevent "a biased or potentially interested judge from ruling on a case." *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d

1056 (citing *State v. Carter*, 77 Wn. App. 8, 12, 888 P.2d 1230, *review denied*, 126 Wn.2d 1026 (1995)), *review denied*, 167 Wn.2d 1002 (2009). Sustaining a claim that the appearance of fairness was violated requires evidence of the judge's bias. *Meredith*, 148 Wn. App. at 903 (citing *State v. Post*, 118 Wn.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992)). "Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing." *Meredith*, 148 Wn. App. at 903 (citing *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674, *review denied*, 127 Wn.2d 1013 (1995)).

Olympic II's "evidence" of bias is that the Board's reviewing judge rewrote the ALJ's findings of fact and conclusions of law in favor of DSHS. But the Board's reviewing judge "shall exercise all the decision-making power that the reviewing [judge] would have had to decide and enter the final order had the reviewing [judge] presided over the hearing." RCW 34.05.464(4). Therefore, the Board's reviewing judge acted within her authority when she rewrote the ALJ's initial order, findings of fact, and conclusions of law. A Board's reviewing judge properly exercising her authority to review an ALJ's initial order does not evince improper bias. Accordingly, Olympic II's contention that the Board's reviewing judge violated the appearance of fairness lacks merit.

OVERCAPACITY

Olympic II contends that the Board's reviewing judge erroneously applied the law by counting the Olympic I residents toward Olympic II's capacity and concluding that Olympic II operated overcapacity. Olympic II argues that "capacity" refers to the number of people *living* in the adult family home and does not include visitors to the home, regardless of whether those visitors are residents of another adult family home. We disagree. In this context, the Board's

reviewing judge correctly interpreted the meaning of "capacity" and properly concluded that Olympic II was operating over its capacity.

Olympic II argues that the Olympic I residents should be considered visitors because "[t]here is no evidence that Ms. Baida ever forced them to come to [Olympic II] from [Olympic I]." Br. of Appellant at 26. Olympic II's assertion rests solely on the testimony of Baida and Otterness. But their testimony directly conflicted with other testimony that Olympic I residents were often at Olympic II for long periods of time because there was no caregiver at Olympic I. The Board's reviewing judge specifically found that Baida's testimony was not credible and instead relied on Shumake's, Corey's, and Tosch's testimony. The testimony that the Board's reviewing judge found credible establishes that Olympic I residents were regularly required to spend long periods at Olympic II because there was no caregiver at Olympic I; therefore, the Board's reviewing judge's findings of fact are supported by substantial evidence.

Olympic II also argues that "capacity" refers to *residents* of the adult family home and the Board's reviewing judge erroneously interpreted "capacity" to mean any person who receives personal care, even if that person does not live at the adult family home. The proper interpretation of a regulation or statute is a conclusion of law, which we review de novo. *See Hardee*, 172 Wn.2d at 6-7. Under former WAC 388-76-10960, DSHS "may impose a remedy or remedies if [DSHS] finds any person listed in WAC 388-76-10950 has . . . (14) [e]xceeded licensed capacity in the operation of an adult family home." Olympic II relies on former WAC 388-76-10030, "License capacity," to support its argument that "capacity" refers to residents living in the adult family home.

Former WAC 388-76-10030 states,

(1) [DSHS] will only issue an adult family home license for more than one but not more than six residents.

     (2) In determining the home's capacity, [DSHS] must consider the:

     (a) Structural design of the house;

     (b) Number and qualifications of staff;

     (c) Total number of people living in the home who require personal or special care, including:

     (i) Children; and

     (ii) Other household members;

     (d) The number of people for whom the home provides adult day care; and

     (e) The ability for the home to safely evacuate all people living in the home.

According to Olympic II, former WAC 388-76-10030 establishes that the capacity of an adult family home is calculated solely on the number of residents or people living in the home. But Olympic II's interpretation of "capacity" is flawed because (1) it ignores the definition of "capacity" in former WAC 388-76-10000, and (2) it reads former WAC 388-76-10030 out of context with the entirety of Title 388 WAC.

Former WAC 388-76-10000 defines "capacity" as "the maximum number of persons in need of personal or special care permitted in an adult family home at a given time and includes related children or adults in the home who receive personal or special care and services." "Personal care services" is defined as "both physical assistance and/or prompting and supervising the performance of direct personal care tasks as determined by the resident's needs." Former WAC 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. It is undisputed that the Olympic I residents were residents of an adult family home in need of personal care services. Therefore, at the time that the Olympic I residents were at Olympic II, there were between 8 and 11 persons in need of personal care services in one adult family home. As a result, Olympic II exceeded its capacity, which allowed for no more than 6 persons in need of personal care services in the home.

Furthermore, former WAC 388-76-10030 does not govern how DSHS calculates capacity for the purposes of determining whether an adult family home is operating over its license capacity. Rather, former WAC 388-76-10030 provides the guidelines DSHS is required to use when determining what the adult family home's capacity will be. Reading former WAC 388-76-10030 in the context of Title 388 WAC shows that the "license capacity" regulation is used to determine what the license capacity is; the definition of "capacity" in former WAC 388-76-10000 is then used to determine whether, at any given time, the adult family home is operating above the previously determined capacity.

Olympic II's interpretation of "capacity" also leads to an absurd result that we do not believe the legislature intended. In Washington, "'[r]ules of statutory construction apply to administrative rules and regulations, particularly where . . . they are adopted pursuant to express legislative authority.'" *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002) (internal quotation marks omitted; alteration in original) (quoting *City of Kent v. Beigh*, 145 Wn.2d 33, 45, 32 P.3d 258 (2001)). We avoid a construction that results in unlikely, absurd, or strained consequences because we presume that the legislative body did not intend absurd results. *Cannon*, 147 Wn.2d at 57. Under Olympic II's interpretation of the regulations, an adult family home can have an unlimited number of vulnerable adults in need of personal care or services in the home during the day, provided that only six of them actually reside in the adult family home. Such a result would clearly undermine the purpose of regulating the capacity of an adult family home.

The Board's reviewing judge did not erroneously interpret the law when she concluded that Olympic I residents requiring personal care counted toward the overall capacity of Olympic II. Therefore, the Board's reviewing judge did not err when she concluded that Olympic II was

operating overcapacity when Olympic I residents were at Olympic II, not merely visiting, but were there because there was no caregiver available at Olympic I.

The overcapacity citation is, alone, sufficient to support DSHS's decision to revoke Olympic II's license. However, DSHS also cited Olympic II for numerous other violations related to the provision of care and services. Olympic II has also challenged these additional violations. After a thorough, independent review of the record, we hold that substantial evidence supports the Board's reviewing judge's findings of fact and she properly concluded that, in addition to overcapacity, DSHS proved the other cited violations.

ATTORNEY FEES

Olympic II requests attorney fees under RCW 4.84.350. Under RCW 4.84.350(1), "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees." We affirm the Board's reviewing judge's decision revoking Olympic II's adult family home license. Therefore, Olympic II is not the prevailing party and is not entitled to attorney fees.

QUINN-BRINTNALL, J.

We concur:

HUNT, J.

JOHANSON, A.C.J.

13