STATE OF WASHINGTON

2017 DEC 11 PM 1:44



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CAPTAIN BRUCE NELSON,   )
            )  DIVISION ONE
    Appellant,    )
            )  No. 75559-5-I
    v.       )
            )
STATE OF WASHINGTON and  )
WASHINGTON STATE BOARD OF )
PILOTAGE COMMISSIONERS,  )
            )  UNPUBLISHED OPINION
    Respondent.   )
            )  FILED: December 11, 2017
_____)

DWYER, J. — Captain Bruce Nelson appeals from the order of the superior court affirming the Board of Pilotage Commissioners' final order denying him a pilot's license. On appeal, he contends that several of the Board's findings of fact are not supported by substantial evidence, that the Board's final order was arbitrary and capricious, that the Board failed to conduct rule making in adopting a reporting form used to record his performance during a training program, that the Board engaged in an unlawful procedure or decision-making process in denying him a pilot's license, that the criteria applied by the Board in denying him a pilot's license were vague in violation of his right to due process, that the Board denied him a meaningful opportunity to be heard in a meaningful time, and that two Board commissioners engaged in unlawful *ex parte* communications with the Board's legal counsel.

Concluding that there was no error, we affirm.

I

The Board of Pilotage Commissioners is charged with training, licensing, and regulating marine vessel pilots operating in the Puget Sound and Grays Harbor pilotage districts. When the Board determines that the pilotage districts require additional pilots to optimize the pilotage service therein, the Board invites those captains who have already demonstrated a high level of experience as sea captains to apply for a pilot's license. Obtaining a pilot's license is a multi-step process involving examinations and, if successful in the examinations, a complex training program. An applicant's invitation to apply for a pilot's license or to participate in the training program does not guarantee that the Board will issue a pilot's license to the applicant.

In 2006, Nelson was invited to apply for a pilot's license. He successfully took the Board's written and simulator examinations, scoring 9th out of 18 applicants. He was then invited to enter into the Board's pilotage training program for the Puget Sound Pilotage District. Nelson's invitation letter detailed a training program that was anticipated to involve 174 trips and was tailored to his experience as a sea captain, aiming to give him exposure to the wide variety of ships and conditions that a pilot in the Puget Sound pilotage district may encounter.

Nelson's training program—along with the training program for other applicants—was overseen both by the Board and a committee of licensed pilots, known as the Training Evaluation Committee. The Committee was designated

by the Board to manage the training program. In that capacity, the Committee tracked the applicants' progress in the training program through direct observation during training trips and a comprehensive review of training trip report forms submitted by supervising pilots after each completed trip.

The training trip report forms allowed the supervising pilot to indicate on a point scale an applicant's effectiveness on that trip with regard to specified categories related to the criteria used by the Board in making licensing and training decisions.[1] In addition, the report forms contained a written comment section wherein the supervising pilot could make specific comments about the trip and the applicant's performance. Each week, the information in each applicant's training trip report forms would be consolidated into a spreadsheet and provided to the applicant. Thereafter, at the end of a training period, the Committee would review the applicant's record and issue its recommendation to the Board as to whether the applicant should be licensed, should not be licensed, or should undergo additional training.

Nelson accepted the training terms in mid-November and his training program commenced in January 2007. Seven months and over 100 training trips later, the Committee reviewed Nelson's performance. The Committee determined that Nelson had performed inconsistently and recommended that the

---

[1] The training trip report form included the categories of preparation, navigation, ship handling, and master/pilot/bridge team interface. An applicant's performance in each of the categories was recorded on a four-point scale. Nearly a year into Nelson's training program, the Board altered the training trip report form, adding "the domains of anchoring, tug escort procedures, and special circumstances." The Board also changed the point scale from a four-point scale to a seven-point scale. The alterations to the training trip report form applied to all ongoing training programs.

No. 75559-5-I/4

Board extend Nelson's training program by two months. The Board then considered the Committee's recommendation and unanimously agreed to extend Nelson's training program, adding specific training trips to his training program in an attempt to address the inconsistencies in his performance.

Two months later, the Committee reviewed Nelson's training program performance. On this occasion, the Committee issued a split recommendation to the Board. Three committee members recommended that the Board issue a license to Nelson and two members recommended that he receive additional training. A majority of the Board (4-3) rejected the recommendation of the majority of the Committee members and voted instead to extend Nelson's training program.

Three months later, the Committee reviewed Nelson's performance during the training program and determined that there was a "disconnect" in his ship-handling skills, that he lacked situational awareness, and that he lacked the ability to process "all the necessary information" in confined waterways. With this, the Committee recommended to extend Nelson's training. The Board agreed with the Committee's recommendation and unanimously voted to extend Nelson's training program.[2]

A month and a half later, the Committee reviewed Nelson's performance and again recommended to extend his training, this time for four additional

---

[2] In January 2008, Nelson contracted an illness and the Board voted to extend his training until February.

- 4 -

months. The Board agreed with the Committee's recommendation and extended his training program.

Three months later, Nelson participated in his 221st training trip. This trip involved a grain ship, the Pier 86 grain terminal, and an evaluation of Nelson's docking skills using a tugboat. During that trip, a senior supervising pilot—and member of the Committee—was forced to intervene in Nelson's tugging of the grain ship in order to avoid substantial damage to the grain terminal and to the ship. The supervising pilot managed to reduce the ship's speed, stabilizing it 30 feet away from its docking berth.

One month later, Nelson completed his final training program extension. By that time, he had taken 243 training trips.

The Committee engaged in an extensive review of Nelson's performance during the training program. The Committee determined that he was performing many piloting tasks well. The Committee concluded, however, that Nelson performed inconsistently throughout his extended training program regarding criteria that the Committee viewed as "essential when docking and undocking a ship," specifically, the "critical ship handling elements of speed control, heading control, and the use of tugboats." Relatedly, the Committee noted with concern that there were 11 instances, occurring after Nelson had already completed 80 training trips, where a supervising pilot felt compelled to intervene in Nelson's piloting.

Moreover, the Committee viewed the Pier 86 grain terminal intervention as a "very serious" intervention. It concluded that the training trip was characterized

as relatively easy and that the intervention had occurred near the end of Nelson's training program. The Committee expressed concern that Nelson was not improving as an applicant and, notably, that "there was a significant risk to the public for continuing him in the training program." Therefore, the Committee unanimously recommended that the Board not license Nelson.

The Board elected to defer voting on the Committee's recommendation, allowing Nelson to prepare his own presentation to the Board. In the intervening six months, Nelson requested, gathered, and submitted information to the Board, and, in October 2008, presented his argument. Two months later, the Board unanimously voted to deny issuance of a license to Nelson.

Nelson timely sought an adjudicative proceeding before an administrative law judge (ALJ) to review the Board's decision. The parties conducted extensive discovery and a seven-day hearing resulted. During the hearing, Nelson sought to introduce evidence comparing the Board's evaluation of his performance with that of other similarly situated applicants in the training program who the Board eventually voted to license. The ALJ excluded the evidence, determining that it was not probative. After the hearing, the ALJ issued an initial order affirming the Board's decision not to license Nelson.

Nelson appealed the ALJ's initial order and the Board appointed a review officer to review the initial order and prepare a final order on behalf of the Board. Upon consideration, the review officer affirmed the ALJ's order and issued the Board's final order. The final order incorporated the ALJ's findings of fact and

conclusions of law and included additional findings of fact by the reviewing officer.

Nelson appealed the Board's final order to the King County Superior Court, arguing that the ALJ erred by excluding the evidence comparing the Board's evaluation of his performance in the training program with that of other similarly situated applicants. The superior court judge agreed, remanding the case with instructions to allow Nelson to present comparator evidence in an adjudicative proceeding to ensure that the applicants' performance in the training program was measured against objective criteria.

A six-day administrative hearing resulted before the ALJ who presided over the initial hearing. At the hearing, the parties presented evidence comparing the Board's evaluation of Nelson's performance in the training program with that of similarly situated applicants. Thereafter, the ALJ issued an initial order on remand affirming the Board's decision not to license Nelson.

Nelson appealed the ALJ's initial order on remand and the Board appointed a different review officer to review the initial order and prepare the Board's final order. The review officer affirmed the ALJ's initial order on remand and issued the Board's final order. The final order incorporated the ALJ's findings of fact and conclusions of law and included several additions to the ALJ's findings of fact and conclusions of law.

Nelson appealed the Board's final order to the King County Superior Court. The superior court affirmed the Board's final order.

II

A

We review a decision of an agency pursuant to the Administrative Procedure Act[3] (APA). Davidson Serles & Assocs. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 159 Wn. App. 148, 154, 244 P.3d 1003 (2010) (citing Thurston County v. Cooper Point Ass'n, 148 Wn.2d 1, 7, 57 P.3d 1156 (2002)). The APA requires that we base our review upon the record made before the agency. Davidson Serles & Assocs., 159 Wn. App. at 154 (citing City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wn.2d 38, 45, 959 P.2d 1091 (1998)). We review the agency's legal conclusions de novo, giving substantial weight to the agency's interpretation of the statute that it administers. Davidson Serles & Assocs., 159 Wn. App. at 154 (citing City of Redmond, 136 Wn.2d at 46). The burden of demonstrating the invalidity of the agency's action is on the party asserting invalidity. RCW 34.05.570(1)(a). We may grant relief from an agency action only if we determine "that a person seeking judicial relief has been substantially prejudiced by the action complained of." RCW 34.05.570(1)(d).

B

As a preliminary matter, Nelson challenges several of the Board's findings of fact as not supported by substantial evidence. We discuss each challenged finding as necessary.

---

[3] Ch. 34.05 RCW.

- 8 -

Nelson first contends that substantial evidence does not support the Board's finding that adopted the reports and opinions submitted by the Board's expert witness.

We defer to the expertise and experience of the Board regarding expert witness credibility determinations. Seattle City Light v. Swanson, 193 Wn. App. 795, 816, 373 P.3d 342 (2016) (citing Beatty v. Fish & Wildlife Comm'n, 185 Wn. App. 426, 449, 341 P.3d 291 (2015), review denied, 183 Wn.2d 1004 (2015)); Port of Seattle v. Pollution Control Hearings Bd., 151 Wn.2d 568, 588, 90 P.3d 659 (2004). Here, it is evident that the Board considered the credibility of the expert witness and all of the witness's testimony and evidence when it credited his testimony in entering findings of fact. Nelson's claim fails.

Nelson next contends that substantial evidence does not support the Board's finding of fact that a training program unique to each applicant was created. But Nelson's appellate briefing effectively concedes that the training trips assigned to each pilot applicant were unique, acknowledging that the training trips between applicants were "substantially similar" and "comparable" and that "the small variations simply account fo [sic] trainees' prior background and experience." Nelson's claim fails.

Lastly, Nelson's appellate briefing sets forth a list of findings of fact that he contends are not supported by substantial evidence. However, his appellate briefing fails to present argument or analysis with regard to these findings in relation to a substantial evidence claim. "Unsubstantiated assignments of error are deemed abandoned." Kittitas County v. Kittitas County Conserv. Coal., 176

Wn. App. 38, 54, 308 P.3d 745 (2013). We thus deem abandoned Nelson's remaining substantial evidence challenges.

There was no error.[4]

C

Nelson next contends that the Board's decision to deny him a pilot's license was arbitrary and capricious. We disagree.

We review issues of law de novo, including whether an agency's decision is arbitrary and capricious. Stewart v. Dep't of Soc. & Health Servs., 162 Wn. App. 266, 273, 252 P.3d 920 (2011) (citing Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 149 Wn.2d 17, 24, 65 P.3d 319 (2003)).

Pursuant to RCW 34.05.570(3)(i), a petitioner may challenge an agency's order on the ground that the order is arbitrary or capricious.

> "'Arbitrary and capricious'" refers to "'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'"

Pub. Util. Dist. No. 2 of Pac. County v. Comcast of Wash. IV, Inc., 184 Wn. App. 24, 45, 336 P.3d 65 (2014) (internal quotation marks omitted) (quoting Lane v. Port of Seattle, 178 Wn. App. 110, 126, 316 P.3d 1070 (2013)), review denied, 183 Wn.2d 1015 (2015).

---

[4] Nelson contends that the Board's orders extending his training program were not supported by substantial evidence and were arbitrary and capricious. We decline to consider Nelson's claim. Only final agency actions are subject to judicial review. Wells Fargo Bank, N.A., v. Dep't of Revenue, 166 Wn. App. 342, 355-56, 271 P.3d 268 (2012); accord Bock v. State Bd. of Pilotage Comm'rs, 91 Wn.2d 94, 99, 586 P.2d 1173 (1978).

The Pilotage Act[5] created the Board of Pilotage Commissioners and regulates pilotage in the state of Washington. The act was adopted "to ensure against the loss of lives, loss or damage to property and vessels, and to protect the marine environment" and to encourage and develop "Washington's position as an able competitor for waterborne commerce from other ports and nations of the world." RCW 88.16.005. The Board is to be comprised of commissioners "representing the interests of the people of the state of Washington." RCW 88.16.005.[6]

In addition, the act required that the Board establish rules necessary for enforcement and administration of the act. RCW 88.16.035(1)(a). This included creating "a comprehensive training program to assist in the training and evaluation of pilot applicants before final licensing." RCW 88.16.035(b)(ii). The final licensing qualifications for pilot applicants include successful completion of a board-specified training program and "such additional qualifications as may be determined by the board." RCW 88.16.035(1)(b)(i), .090(2)(a)(iv), (4).

The act provides that, upon completion of the training program, "the board shall evaluate the trainee's performance and knowledge." RCW 88.16.090(4). Accordingly, the Board promulgated regulations setting forth the criteria by which it evaluates an applicant's performance and knowledge. The Board established

---

[5] Ch. 88.16 RCW.

[6] The Board of Pilotage Commissioners includes appointed commissioners who are "pilots licensed under this chapter and actively engaged in piloting upon the waters covered by this chapter," individuals "actively engaged in the ownership, operation, or management of deep sea cargo and/or passenger-carrying vessels," "a representative from a recognized environmental organization concerned with marine waters," and "persons interested in and concerned with pilotage, maritime safety, and marine affairs, with broad experience related to the maritime industry exclusive of experience as either a state licensed pilot or as a shipping representative." RCW 88.16.010.

- 11 -

that the criteria "shall include, but not be limited to: Performance in the training program; piloting and ship handling and general seamanship skills; local knowledge; and, bridge presence and communication skills." WAC 363-116-080(5). The act further provides that, after carrying out its evaluation, "[t]he board, as it deems appropriate, may then issue a pilot license, delay the issuance of the pilot license, deny the issuance of the pilot license, or require further training and evaluation." RCW 88.16.090(4).

In reviewing the Board's actions, we keep in mind that the Board "has considerable discretion" in carrying out its statutorily authorized duties. Bock v. Bd. of Pilotage Comm'rs, 91 Wn.2d 94, 100, 586 P.2d 1173 (1978) (citing State ex rel. Sater v. Bd. of Pilotage Comm'rs, 198 Wash. 695, 90 P.2d 238 (1939)).

Here, the Board voted to deny issuance of a license to Nelson based upon its evaluation of his performance and knowledge. The Board indicated that it had evaluated Nelson's candidacy based upon the criteria set forth in WAC 363-116-080(5). With this criteria in mind, the Board considered the Committee's licensing recommendation, the Board's review of all of Nelson's training trip report forms, and the experience and expertise of the Board's commissioners.

The Board determined that, during Nelson's extended training program, he had failed to consistently perform regarding the ship-handling criteria essential to docking and undocking a ship. Relatedly, the Board found as a matter of concern the number of occasions on which a supervising pilot was compelled to intervene in Nelson's piloting during training trips taking place late in his training program.

The Board also determined that, in denying to issue Nelson a license, "[t]he details of each trip mattered." This is notable because the Board found that the major intervention at the Pier 86 grain terminal a month prior to the end of his fourth training extension was a "very serious" intervention. The Board found that the Pier 86 incident supported a conclusion that he was not improving and that a significant risk to the public was posed by continuing him in the training program.

In this light, the Board's decision not to license Nelson was plainly based on the facts and circumstances underlying his performance and knowledge.

There was no error.

Nelson next contends that the Board's decision was arbitrary and capricious because it treated him differently than it treated other license applicants. We disagree.

The Board found that there were 18 similarly situated applicants who took and passed the written and vessel simulator examinations at the same time that Nelson did and who were invited to participate in the training program. Of those applicants, 6 received training extensions. Ultimately, 3 of the applicants were not licensed.

The Board further found that the applicants were evaluated consistently. The Board determined that each applicant was required to pass the same written and vessel simulator tests and participate in at least 130 observational and supervised training trips. The Board also determined that the same training trip report forms were used to track the applicants' progress during the training program. In addition, the Board found that those applicants who struggled were

consistently given additional training trips tailored to the area of difficulty that the applicant was experiencing. The Board further found that it had closely examined the entire training record of each applicant and considered of great significance the details of each applicant's training trips. The Board also found that it had applied the licensing criteria set forth in WAC 363-116-080(5) to each applicant in deciding whether to license the applicant.

Given that the Board assessed the applicants using the same methodology and criteria, the Board did not evaluate Nelson's performance and knowledge in a way that was meaningfully different than its evaluation of other similarly situated applicants. There was no error.

Accordingly, the Board's decision to deny issuance of a license to Nelson was not arbitrary or capricious.[7]

---

[7] Nelson contends that the Board's decision was arbitrary and capricious because it did not consider the statistical evidence that, he claims, supports that he was subjected to more difficult trips than other applicants and that his trip report ratings and number of interventions were comparable to applicants who were granted a pilot's license. This contention is unavailing.

The Board's decision is not arbitrary and capricious merely because the Board elected not to adopt Nelson's preferred method of evaluating pilot applicants. Rather, the Board evaluated the applicants' performance and knowledge using the criteria duly promulgated pursuant to its statutory authority. Indeed, the Board found that, rather than comparing isolated types of incidents, it "closely examined the entire record of each trainee" and made its decision "based on each trainee's performance."

Nelson next contends that the Board's decision to deny him a license constituted the exercise of arbitrary administrative power in violation of the Fourteenth Amendment to the United States Constitution as well as article I, section 12 of the Washington Constitution. Because we reject Nelson's statutory claim of arbitrary and capricious action by the Board, we also reject Nelson's constitutional claim of arbitrary and capricious action by the Board.

Nelson next contends that the Board's decision to decline to issue him a pilot's license was arbitrary and capricious because the Board's final order relied upon portions of an expert witness's report that had been withdrawn from evidence. This claim fails. The ALJ indicated that those portions of the unredacted report that were excluded would not be considered and Nelson presents no analysis or argument showing that the Board relied on the portions of the expert's report that were withdrawn.

D

Nelson next contends that the Board violated the APA by adopting and altering the training trip report form used to record applicants' training trip performance without first engaging in rule making. We disagree.

We review de novo whether an agency's action constitutes a "rule" under the APA. "[I]t is axiomatic that '[f]or rule-making procedures to apply, an agency action or inaction must fall into the APA definition of a rule.'" Budget Rent A Car Corp. v. Dep't of Licensing, 144 Wn.2d 889, 895, 31 P.3d 1174 (2001) (alteration in original) (quoting Failor's Pharmacy v. Dep't of Soc. & Health Servs., 125 Wn.2d 488, 493, 886 P.2d 147 (1994)). Under the APA, "[r]ule" includes "any agency order, directive, or regulation of general applicability . . . (d) which establishes, alters, or revokes any qualifications or standards for the issuance, suspension, or revocation of licenses to pursue any commercial activity, trade, or profession." RCW 34.05.010(16). We note that "an otherwise broad interpretation of 'rule' would 'serve as the straightjacket of administrative action.'" Providence Physician Servs. Co. v. Dep't of Health, 196 Wn. App. 709, 726, 384 P.3d 658 (2016) (quoting Budget Rent A Car, 144 Wn.2d at 898).

The training trip report forms used during the time in which Nelson was participating in the training program were provided by the Board pursuant to WAC 363-116-078(13).[8] The training trip report form set forth the piloting domains of preparation, navigation, ship handling, and master/pilot/bridge team

---

[8] "After each trip, the supervising pilot shall complete a trip report form provided by the board." WAC 363-116-078(13).

interface and included a four-point scale for recording an applicant's performance in those domains. Over a year into his training program, the Board altered its trip report form, adding the domains of anchoring, tug escort procedures, and special circumstances and setting forth a seven-point scale, rather than a four-point scale.

The piloting domains set forth in the training trip report form are based on the Board's licensing criteria. Indeed, the trip report form's piloting domains—preparation, navigation, ship handling, and master/pilot/bridge team interface, anchoring, tug escort procedures, and special circumstances—are plainly derived from the Board's non-exhaustive list of evaluation criteria—which includes "[p]erformance in the training program; piloting and ship handling and general seamanship skills; local knowledge; and, bridge presence and communication skills." WAC 363-116-080(5). The training trip report form thus did not establish or alter a qualification or standard for the issuance of a pilot's license. Rather, it set forth a recording methodology to track an applicant's performance in the training program based on preestablished criteria. Similarly, the Board's alteration of the point scale in the training trip report form did not alter the qualifications or standards for licensing but, rather, set forth a more nuanced recording methodology for tracking an applicant's performance.

Thus, the Board's adoption and alteration of the trip report form does not fall into the APA definition of a rule.[9]

_____

[9] Nelson relies upon two decisions by our Supreme Court that, he claims, support his argument that the Board's adoption and alteration of the training trip report form constituted a rule under the APA. See Simpson Tacoma Kraft Co. v. Dep't of Ecology, 119 Wn.2d 640, 647, 835 P.2d 1030 (1992) (adoption of statewide numeric water quality standard for discharge of a

There was no error.

E

Nelson next contends that, during the course of the administrative proceedings in this matter, the Board engaged in several unlawful procedures or decision-making processes. Each allegation is discussed in turn.

RCW 34.05.570 provides, in pertinent part: "(3) Review of agency orders in adjudicative proceedings. The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that: . . . (c) The agency has engaged in *unlawful* procedure or decision-making process, or has failed to follow a *prescribed* procedure." (Emphasis added.) Again, this court "shall grant relief only if it determines that a person seeking judicial relief has been *substantially prejudiced* by the action complained of." RCW 34.05.570(1)(d) (emphasis added).

We do not consider arguments unsupported by authority or analysis. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Nelson first contends that the Board engaged in an unlawful procedure or decision-making process when a Board commissioner engaged in rule making concerning a proposed rule that would exclude evidence seeking to compare

---

pollutant constitutes an agency rule because violation of standard would subject violators to punishment); Failor's Pharmacy, 125 Wn.2d at 495-96 (alteration of prescription services reimbursement schedule constitutes agency rule because reimbursement schedule regarded a benefit conferred by law).

Neither decision supports his claim. The training trip report forms—and any point on the point-scale that was recorded by a supervising pilot—neither subject applicants to punishment nor confer a benefit by law. Rule making was not required.

various pilot applicants' performances against one another as part of the Board's evaluation of an applicant.

As an initial matter, Nelson's appellate briefing does not identify *which* prescribed procedure or decision-making process that the commissioner in question failed to follow. In this way, Nelson does not support his claim with authority or analysis. In addition, Nelson does not show that the commissioner's participation in rule making substantially prejudiced him. Indeed, he presents no evidence that the commissioner in question participated in the deliberations surrounding the final order at issue or that the commissioner's participation in the rule making procedure impacted the initial or final order denying the issuance of a license to him. There was no error.

Nelson next contends that the Board engaged in an unlawful procedure or decision-making process when a Board commissioner, during a jury trial concerning another plaintiff's suit against the Board, said that he was "pleased with the results" of the ALJ's initial order on remand in Nelson's administrative matter.

However, Nelson does not present authority or analysis regarding the prescribed procedure or decision-making process that, he claims, the commissioner failed to follow. Even so, Nelson does not show that the commissioner's comment during the unrelated litigation substantially prejudiced him. He again presents no evidence that the commissioner in question participated in the Board's final order here at issue or that the commissioner's

comment impacted the Board's final order denying issuance of a license to him. There was no error.

Nelson next contends that the Board engaged in an unlawful procedure or decision-making process when, during the initial adjudicative proceeding in 2010, the ALJ dismissed an expert witness due to a time constraint before Nelson's counsel indicated that she had finished her cross-examination of the witness.

Nelson's appellate briefing also does not present authority or analysis regarding the prescribed procedure or decision-making process in which the ALJ failed to engage. Moreover, Nelson does not show that he was substantially prejudiced by the ALJ's decision to dismiss the expert witness. The ALJ ruled that Nelson's counsel had successfully authenticated a document during cross-examination and otherwise had a fair opportunity to cross-examine the witness in the time allowed. In addition, Nelson's appellate briefing neither identifies the evidence that he was prevented from eliciting from the expert witness nor the manner in which that evidence allegedly impacted the Board's final order denying him a license. There was no error.

Nelson next claims that the Board engaged in unlawful procedure or decision-making when the ALJ allowed an expert witness's unredacted report to be placed in the administrative record when portions of the report had been previously excluded or withdrawn.

Nelson's appellate briefing does not present authority or analysis regarding the prescribed procedure or decision-making process in which the ALJ failed to engage. Moreover, even were we to consider his claim, Nelson does

not demonstrate how he was prejudiced by the ALJ's actions. Indeed, he does not show that the Board, in fact, relied upon those portions of the expert's report that were excluded or withdrawn, notwithstanding that the report was admitted in an unredacted form. Nelson's claim fails.

Nelson next contends that the Board engaged in an unlawful procedure or decision-making process when it relied upon a memorandum that summarized the Committee's recommendation not to license him prior to voting on whether to issue him a pilot's license. This is so, he asserts, because he was not given access to the memorandum prior to the Board's licensing vote.

Again, Nelson fails to present authority or analysis regarding a procedure or decision-making process in which the Board failed to engage. Regardless, even if we considered his claim, Nelson does not show that the Board's possession of a summative memorandum resulted in substantial prejudice to him. Indeed, the information in the memorandum had been previously provided and presented to the Board and to Nelson during the course of his training program. There is no indication that any of the information set forth in the memorandum was new information. No entitlement to relief is established.

Accordingly, Nelson does not establish that the Board engaged in an unlawful procedure or decision-making process during the administrative proceedings.

F

Nelson next contends that the Board's criteria for licensing pilots are unconstitutionally vague.

We may grant relief from an agency's order when "[t]he order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied." RCW 34.05.570(3)(a).

"'[A]n administrative rule adopted pursuant to statutory authority is presumed valid and should be upheld when consistent with the enabling statute.'" Keene v. Bd. of Accountancy, 77 Wn. App. 849, 854, 894 P.2d 582 (1995) (quoting Ravsten v. Dep't of Labor & Indus., 108 Wn.2d 143, 154, 736 P.2d 265 (1987)). "Similarly, regulations and statutes are presumed to be constitutional." Keene, 77 Wn. App. at 854 (citing Haley v. Med. Disciplinary Bd., 117 Wn.2d 720, 739, 818 P.2d 1062 (1991)).

> As with a statute, a rule is void for vagueness "if it is framed in terms so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" Haley, [117 Wn.2d] at 739 (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S. Ct. 126, 128, 70 L. Ed. 322 (1926)). However, it is not necessary that a person be able to predict with complete certainty exactly when his or her conduct would be classified as prohibited. Haley, [117 Wn.2d] at 740. Moreover, "the use of vague terms does not necessarily render a statute as a whole impermissibly vague." Haley, [117 Wn.2d] at 741.

Keene, 77 Wn. App. at 854.

Indeed, "impossible specificity standards are not required." Heesan Corp. v. City of Lakewood, 118 Wn. App. 341, 352, 75 P.3d 1003 (2003) (citing City of Seattle v. Eze, 111 Wn.2d 22, 26, 759 P.2d 366 (1988)). This is because, "'[c]ondemned to the use of words, we can never expect mathematical certainty from our language.'" Haley, 117 Wn.2d at 740 (quoting Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)).

- 21 -

Our decision in Chandler v. Office of Insurance Commissioner, 141 Wn. App. 639, 173 P.3d 275 (2007), is instructive. At issue in Chandler was whether a statute setting forth that "an applicant for an insurance agent's license must be 'a trustworthy person'" was unconstitutionally vague. 141 Wn. App. at 660 (quoting former RCW 48.17.150(1)(f) (2005)). We rejected Chandler's claim, reasoning that,

> The term "untrustworthy" need not be purely objective. And including a vague term in a statute does not necessarily render it impermissibly vague because courts do not analyze statutory words in isolation from the context in which they appear. The common knowledge and understanding of members of a profession can clarify a statutory term, such as untrustworthiness, when no objective standard is provided. The purpose of RCW 48.17.530 is to protect the public and the profession's standing in the eyes of the public. In the context of the common knowledge and understanding of members of the insurance profession, the terms "trustworthy" and "untrustworthy" are sufficiently clear to put an insurance agent on notice that certain conduct is prohibited.

Chandler, 141 Wn. App. at 661 (footnotes omitted) (citing State v. Foster, 91 Wn.2d 466, 474, 589 P.2d 789 (1979); Haley v. Med. Disciplinary Bd., 117 Wn.2d 720, 742, 818 P.2d 1062 (1991); Cranston v. City of Richmond, 40 Cal.3d 755, 765, 710 P.2d 845, 221 Cal. Rptr. 779 (1985); Morrison v. State Bd. of Educ., 1 Cal.3d 214, 461 P.2d 375, 82 Cal. Rptr. 175 (1969)).[10]

Here, the Board relied upon the criteria set forth in WAC 363-116-080(5) in voting to deny issuing a license to Nelson. Again, the criteria include, but are not limited to, "[p]erformance in the training program; piloting and ship handling

---

[10] See also Haley, 117 Wn.2d at 742-43 ( "moral turpitude" in a disciplinary statute not unconstitutionally vague because "[p]hysicians no less than teachers, . . . veterinarians, . . . police officers, . . . [or insurance agents] will be able to determine what kind of conduct indicates unfitness to practice their profession").

and general seamanship skills; local knowledge; and, bridge presence and communication skills." WAC 363-116-080(5).

The criteria set forth in WAC 363-116-080(5) are not unconstitutionally vague. First, the licensing criteria adopted by the Board are informed by the provisions of chapter 88.16 RCW. Again, the intended purpose of the chapter is "to ensure against the loss of lives, loss or damage to property and vessels, and to protect the marine environment" and to encourage and develop "Washington's position as an able competitor for waterborne commerce from other ports and nations of the world." RCW 88.16.005. In addition, the Board is authorized to issue pilot's licenses so as to ensure "safe, fully regulated, efficient, and competent pilotage service." RCW 88.16.035(1)(d). Therefore, the licensing criteria are informed by the intent of the legislature and the scope of the Board's statutory authority, both of which emphasize safety, environmental protection, and commercial efficacy.

Furthermore, the licensing criteria are further informed by the common knowledge and understanding of members of the pilotage profession and the traits that would render a pilot applicant unfit to pilot a marine vessel.

Thus, the Board's licensing criteria are not unconstitutionally vague. Nelson's claim fails.[11]

_____

[11] Nelson relies on three appellate decisions to support his claim that the Board's licensing criteria are impermissibly vague. Derby Club, Inc. v. Becket, 41 Wn.2d 869, 252 P.2d 259 (1953), Sater, 198 Wash. 695; Woods v. Dist. of Columbia Nurses' Examining Bd., 436 A.2d 369 (D.C. App. 1981).

Nelson's reliance is unavailing. Unlike the criteria here at issue, the challenged regulation or statute in the decisions relied upon by Nelson either set forth no standard at all or set forth a standard devoid of any concrete meaning. See Derby Club, 41 Wn.2d at 877 (statute "prescribe[d] _no standards_ by which the liquor control board may determine who is and who is not entitled to a license to operate a bottle club") (emphasis added)); Sater, 198 Wash. at 701

G

Nelson next contends that the Board's decision denying him a pilot's license deprived him of his right to due process. This is so, he asserts, because the period of time between the completion of his training program and the Board's final order on remand denied him a meaningful opportunity to be heard in a meaningful time.

> "Procedural due process requires notice and an opportunity to be heard '"at a meaningful time and in a meaningful manner."'" [In Re Det. of Morgan, 180 Wn.2d [312,] 320[, 330 P.3d 774 (2014)] (quoting Amunrud [v. Bd. of Appeals], 158 Wn.2d [208,] 216[, 143 P.3d 571 (2006)]) (quoting Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976))). "The process due depends on what is fair in a particular context." Morgan, 180 Wn.2d at 320. In Mathews, the United States Supreme Court articulated a balancing test to aid in determining when, and to what extent, procedural protections are required:
>> [D]ue process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
> 424 U.S. at 335.

In re Det. of Hatfield, 191 Wn. App. 378, 396-97, 362 P.3d 997 (2015).

Here, Nelson made use of the administrative procedures that were available to him to challenge the Board's orders. The amount of time that passed

---

(interpretation of act unconstitutional if it permits Board "to issue a license to any applicant they may believe to be qualified"); Woods, 436 A.2d at 373-74 (regulation allowing board to issue a license "[u]pon showing of cause satisfactory to it" unconstitutional because no standard defined what causes were satisfactory for a license).

between hearings in this matter was reasonable. There is no indication that Nelson was unable to be heard in a meaningful time.

Moreover, in asserting that an unconstitutional denial of due process resulted from the time period taken to decide whether to issue him a pilot's license, Nelson argues only the first of the three Mathews factors: that he had a property and liberty interest in his trainee license and training stipend. However, even assuming that he has such an interest, Nelson does not attempt to establish the remaining two factors, as required by Mathews. Rather, he asserts that, because of the amount of time between the end of his training program, the Board's vote to not license him, and the completion of the administrative and judicial review of the Board's final order, he was necessarily deprived due process. By failing to engage in a suitable analysis of the Mathews factors, Nelson fails to establish a due process claim.[12] There was no error.

H

Nelson next contends that he was denied a fair hearing before the Board because, he alleges, the board review officers who reviewed the ALJ's initial orders in this matter engaged in unlawful *ex parte* communications with the Board's legal counsel.

---

[12] Nelson also contends that the Board denied him due process when it ended his training program, thereby depriving him of his trainee license and a $6,000 per month stipend. To support this proposition, Nelson, in a footnote, relies upon two cases.

Nelson fails to present argument or analysis showing the applicability of this authority to the matter here at issue. RAP 10.3(a)(5), (6). Moreover "'placing an argument . . . in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal.'" Pub. Util. Dist., 184 Wn. App. at 84 n.49 (internal quotation marks omitted) (quoting Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 497, 254 P.3d 835 (2011)). We decline to consider this aspect of Nelson's claim.

RCW 34.05.455(1) reads: "A presiding officer may not communicate, directly or indirectly, regarding any *issue* in the proceeding other than communications necessary to procedural aspects of maintaining an orderly process, with any person employed by the agency without notice and opportunity for all parties to participate, except as provided in this subsection." (Emphasis added.)

Nelson first contends that an unlawful *ex parte* communication occurred when the board review officers in question attended an open-door meeting during which the Board's legal counsel mentioned the procedural posture and calendar dates regarding Nelson's superior court litigation against the Board.

The subjects mentioned by the Board's legal counsel were not a substantive communication regarding an issue in Nelson's administrative proceeding. There is no indication that a substantive discussion of the issues presented in his administrative matter took place at the open-door meeting in question. Moreover, Nelson fails to show that he suffered from actual or even probable bias. Nelson's claim fails.

Nelson next contends that a board review officer engaged in unlawful *ex parte* communication with the Board's legal counsel during a closed-door meeting relating to litigation matters.

The Board indicated that the closed-door meeting identified by Nelson concerned litigation relating to another plaintiff's lawsuit against the Board and that his administrative matter was not discussed therein. Nelson does not present evidence rebutting the Board's claim that the meeting concerned

litigation unrelated to his administrative matter. In addition, he does not provide evidence showing that the board review officer's participation in the closed-door meeting prejudiced him. Nelson's claim fails.[13]

Affirmed.

We concur:

---

[13] Nelson next contends that the ALJ, during his administrative proceeding, improperly used the arbitrary and capricious standard in reviewing the Board's decision not to license him. To the contrary, the ALJ's use of the arbitrary or capricious standard was proper. Bock, 91 Wn.2d at 100 (citing Sater, 198 Wash. 695). There was no error.

Nelson next asserts that "remand to the Board's administrative process is futile" because the decision-makers are "entrenched" and "will not consider comparator evidence" or "whether fair and equitable licensing procedures" were used. For this proposition, he cites to RCW 34.05.534(3)(b), relating to exhaustion of remedies prior to filing his petition for review. Whether Nelson exhausted—or was required to exhaust—available administrative remedies prior to filing his petition for review does not bear on whether an order from this court remanding the decision is futile. Nelson does not present further argument or analysis regarding this claim. We thus decline to consider it. In any event, given our ultimate disposition of this appeal, the claim is of no moment.